**In re Kenneth Riley TALCOTT, Marian Louise Talcott, Debtors.**

**FORD MOTOR CREDIT COMPANY, Plaintiff,**

v.

**Kenneth Riley TALCOTT, Defendant.**

**Bankruptcy No. 81–21229.**

**Adv. No. 82–0122.**

United States Bankruptcy Court, D. Kansas.

May 3, 1983.

Robert H. Foerschler, Kansas City, Kan., for plaintiff.

Byron C. Loudon, Kansas City, Kan., for defendant.

## MEMORANDUM OPINION

BENJAMIN E. FRANKLIN, Bankruptcy Judge.

This matter came on for trial on December 1 and 2, 1982, upon a Complaint to Determine Dischargeability of Debt pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6). Plaintiff, Ford Motor

Credit Company (FMCC) appeared by Robert H. Foerschler, of McAnany, Van Cleave & Phillips, P.A. Defendant/debtor, Kenneth Riley Talcott, appeared in person and by Byron C. Loudon, of McDowell, Rice & Smith, Chrtd. Also appearing was debtor, Marian Louise Talcott.

## FINDINGS OF FACT

Based on the exhibits, testimony, pleadings and taking judicial notice of the file of Olathe Ford Tractor, Inc., Bankruptcy No. 80–20846, the Court finds as follows:

1. That this Court had jurisdiction over the parties and subject matter pursuant to Rule 42 of the United States District Court, District of Kansas; and that venue is proper.

2. That the debtors filed a Chapter 7 petition in this Court on December 17, 1981.

3. That FMCC, a wholly owned subsidiary of Ford Motor Company, is a Delaware corporation with its principal place of business in Dearborn, Michigan, and a branch office in Kansas City.

4. That in 1976, Kenneth Talcott acquired Olathe Ford Tractor, Inc. (Olathe Ford), a Ford tractor, equipment and implement dealership in Olathe, Kansas. He served as a shareholder, director, president and chief operating officer until 1980 when Olathe Ford filed a Chapter 11 petition in this Court. Talcott's parents and wife were also principals in Olathe Ford. His father was a salaried employee of Olathe Ford for about nine months; but his wife and mother were never active or salaried participants in Olathe Ford. Talcott was at all times, a salaried employee, earning $28,466.00 in 1978; $33,974.00 in 1979; and $20,630.00 in 1980.

5. That FMCC financed Olathe Ford's purchase of inventory from the Ford Tractor Division of the Ford Motor Company. In an arrangement commonly called "floor plan financing", FMCC would advance the necessary money for Olathe Ford's purchases and take a security interest in the inventory. Olathe Ford granted FMCC a power of attorney to execute in Olathe Ford's behalf, the necessary security documents at the time of each shipment. These documents included notes, chattel mortgages and trust receipts. The trust receipts provided that FMCC retained title in the inventory until paid in full. Olathe Ford was prohibited from pledging, transferring or disposing of the inventory except that:

> "5. The Trustee may sell the Property in the ordinary course of Trustee's business, provided, however, that any and all proceeds thereof shall be fully, faithfully and promptly accounted for and delivered to the Entruster to the extent of the obligation hereby secured.
>
> 6. The Entruster's security interest in the Property shall attach, to the full extent provided or permitted by law, to the proceeds, in whatever form, of any sale thereof by the Trustee until such proceeds are delivered to the Entruster as hereinbefore provided, and to the proceeds of any other disposition of the Property or any part thereof by the Trustee."[1]

Talcott, his parents and his wife executed a continuing guaranty of Olathe Ford's obligations to FMCC.

6. That FMCC had two financing arrangements with Olathe Ford. The "wholesale plan" covered inventory that Olathe Ford sold at retail. Under the wholesale plan, each time Olathe Ford sold an item, it was to remit to FMCC that portion of the proceeds which was the release or payoff value of the item, keeping any excess as profit. The "rental plan" covered inventory that Olathe Ford leased out. Under the rental plan, Olathe Ford was to make monthly payments to FMCC from the monies it received each month from its lessees, keeping any excess as profit.

7. That Olathe Ford's leases had purchase options which many customers ultimately exercised. The parties disputed what Olathe Ford's obligation was when a lessee exercised a purchase option. No doc-

---

1. *FMCC is the Entruster and Olathe Ford the*   trustee.

ument in evidence speaks to the issue. A field sales manager for the Ford Tractor Division and the Kansas City branch manager for FMCC both testified that the only accepted practice and course of dealing was for the dealer to remit the payoff balance to FMCC when a lessee exercised a purchase option. Talcott testified that various Ford personnel had told him he could continue making monthly payments under the rental plan and use the lump sum from the lessee as operating capital. Talcott did not name or call as witnesses any of these Ford personnel. He did admit that none of FMCC's witnesses who testified had ever told him such. FMCC's witnesses included four Ford personnel with dominion over the Olathe Ford store; a field sales manager and zone manager for Ford Tractor; a FMCC sales representative; and the Kansas City branch manager for FMCC.

8. That audits conducted by FMCC in the summer of 1980 disclosed that Olathe Ford had sold items without remitting the payoff balance to FMCC and that Olathe Ford had also failed to remit the payoff balance of leases whose purchase options had been exercised. The audit also revealed that some items were cannibalized or parted out and that Olathe Ford had collected insurance on several stolen items without remitting the insurance proceeds to FMCC. Talcott admitted his failure to remit the payoff balances on retail and lease items, but testified that he intended to pay FMCC when circumstances permitted, and that his motive was to resolve Olathe Ford's cash flow problems. He also admitted to cannibalizing equipment, but testified that he was merely replacing defective parts on equipment so that the customer would not have to wait for Ford Tractor to send new parts. He further testified that he always followed FMCC's suggested accounting system and that Olathe Ford's books and records were always open for FMCC's inspection.

9. That FMCC's final status report (*Ct.Ex. # 1*) dated December 14, 1981, indicated that FMCC sustained the following losses: $35,173.00 in unremitted proceeds of new equipment sold at retail; $43,262.00 in unremitted proceeds of equipment sold on purchase options; $5,709.00 in unremitted proceeds of used equipment sold at retail; $869.00 in estimated unremitted payments on an outstanding lease; $823.00 in actual unremitted payments on an outstanding lease; and $10,120.00 lost value of cannibalized inventory, assuming the inventory was valueless after being cannibalized.

10. That FMCC filed a proof of claim in the Olathe Ford bankruptcy proceeding, which was allowed as unsecured in the amount of $107,549.36. Olathe Ford's unsecured creditors will be paid a dividend of 3.7421408%, pursuant to its plan of liquidation. Thus, FMCC will receive $4,024.65 through Olathe Ford's plan.

11. That in December, 1978, Talcott and his wife purchased a $150,000.00 farm. Thereafter, Talcott stored oil, garden tractors, and mowers in an empty barn on his farm, since Olathe Ford's store was too crowded. Talcott charged Olathe Ford rent, which was paid periodically, at an average monthly rate of $1,200.00 to $1,500.00, about the same rent that Olathe Ford paid for its store. Olathe Ford's bookkeeper testified that Talcott did not fill out expense vouchers for Olathe Ford's payment of rent to him. Some of these payments he directed to be made to himself, some to a "F & K Farms", a joint venture he founded with an employee for the purpose of farming at another location.

12. That property taxes assessed against the farm were $21,850.80 in 1979, and $21,899.30 in 1980.

### CONCLUSIONS OF LAW

This complaint was brought under § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6). However, FMCC has not pursued the § 523(a)(2)(A) ground. No evidence of false representations or false pretenses was offered at trial; nor did FMCC mention § 523(a)(2)(A) in its proposed findings of fact and conclusions of law. Accordingly, the Court finds that FMCC did not make out a prima facie case under § 523(a)(2)(A), and its complaint is therefore, overruled with respect to that ground.

The second ground of FMCC's complaint was § 523(a)(4) which states:

"§ 523. Exception to discharge.

*(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—*

\* \* \* \* \* \*

*(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"*

■ Under this section, fraud or defalcation are actionable only if the debtor was a fiduciary of the creditor; whereas, embezzlement or larceny are actionable whether or not the debtor was a fiduciary. See 3 Colliers on Bankruptcy § 523.14 (15th ed.). FMCC contended that Talcott committed fraud or defalcation. Therefore, the threshold issue herein is whether or not Talcott was a fiduciary of FMCC.

■ The fiduciary relationship contemplated in 11 U.S.C. § 35(a)(4) [Act] and 11 U.S.C. § 523(a)(4) [Code] is one arising out of a pre-existing express or technical trust, not implied or constructive trusts. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *In re Romero,* 535 F.2d 618 (10th Cir.1976); 3 Colliers on Bankruptcy § 523.14 (15th ed.)

■ Courts will find the requisite express or technical trust when a state statute defines the relationship as a trust, when the relationship has the typical attributes of a trust or when the contract expressly creates a trust. In Kansas there is no statute defining a floor plan financing arrangement as a trust. See *In re Romero, supra,* at 621, where the court found a fiduciary relationship between a building contractor and the owner by virtue of a New Mexico statute. Moreover, the relationship of FMCC and Talcott is not characterized by the typical attributes of a trust. See *In re Paley,* 8 B.R. 466, 469, 3 C.B.C.2d 648, CCH ¶ 67,789 (Bkrtcy.E.D.N.Y.1981) where the court found a fiduciary relationship because the agent was required to segregate the funds before remitting them to the principal. And see *Matter of Walker,* 7 B.R. 563, 564, 7 B.C.D. 68 (Bkrtcy.M.D.Ga.1980) where the court found a fiduciary relationship because the agent was required to disburse collected funds and preserve the res through investment.

FMCC contended that the trust receipts created an express trust between it and Talcott. The trust receipts purported to reserve title in FMCC, as the "Entruster", until Olathe Ford, or its agent Talcott, as the "Trustee", paid for the inventory in full.

■ The law is clear that substance over form controls, and the fact that a document has language purporting to create a trust is inconclusive. *Lord's, Inc. v. Maley,* 356 F.2d 456, 458 (7th Cir.1965). The court must look behind the documents and determine the true nature of the parties' relationship.

In a strikingly similar case, the U.S. Supreme Court determined that a floor plan financing arrangement documented by notes, chattel mortgages and trust receipts did not create an express trust or fiduciary relationship within the meaning of the Bankruptcy Act. In *Davis v. Aetna Acceptance Co., supra,* 293 U.S. at 333–334, 55 S.Ct. 153–54, an opinion delivered by Justice Cardozo, the Court stated:

*"... Was petitioner a trustee in that strict and narrow sense?*

*We think plainly he was not, though multiciplicity of documents may obscure his relation if the probe is superficial. The only writing at all suggestive of a trust is the one that is characterized as a trust receipt. What effect would be given to it if it stood alone there is no occasion to consider. It does not stand alone, but is a member of a group which must be read with a collective meaning. The note, the chattel mortgage, the trust receipt and the bill of sale were made at the same time. We must view them all together. Clearly the respondent's only interest in the car was as security for the debt; ... The trust receipt may state that the debtor holds the car as the property of the creditor; in truth it is his own property, subject to a lien.... The re-*

sulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust."

The Court finds that the relationship of FMCC and Talcott is analogous to that of the parties in *Davis, supra*. The fact that FMCC purported to reserve title in its trust receipts was mere form. The substance of the transaction was that FMCC took a security interest in all of Olathe Ford's inventory, nothing more nor less. Accordingly, the Court finds that Talcott was not a fiduciary of FMCC within the meaning of § 523(a)(4) and its complaint is therefore overruled with respect to that ground.

The third ground of FMCC's complaint was § 523(a)(6), which states:

"§ 523. Exceptions to discharge.

*(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—*

\*    \*    \*    \*    \*    \*

*(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; "*

This section applies to conversions of collateral, if the debtor's conduct was willful and malicious. Willful simply means deliberate or intentional. Malicious means wrongful, excessive or without just cause; and malice will be found even in the absence of personal hatred, spite or ill-will. 3 Colliers on Bankruptcy § 523.16[1] (15th ed.); Cowans Bankruptcy Law and Practice § 6.49–6.50 (1983 Interim ed.)

Talcott cited *Davis v. Aetna Acceptance Co., supra*, at 332, 55 S.Ct. 153, where the Court found that the debtor's conversion of the creditor's collateral was not willful or malicious. There the creditor financed the debtor's purchase of inventory and required that the debtor get the creditor's consent before selling any item of inventory. However this requirement was apparently never enforced by the creditor. The Court found no willfulness or malice in the debtor's unauthorized sale of a vehicle, because the debtor had " . . . *an honest, but mistaken*

*belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed."*

The question herein is whether Talcott's conduct was based on an honest belief engendered by a course of dealing, that he could keep the proceeds and remit them when cash flow permitted and that he could cannibalize inventory to prevent customers from being inconvenienced by waiting for replacements for defective parts.

The Court heard testimony of Talcott, which conflicted with testimony of a field sales manager for the Ford Tractor Division and the Kansas City branch manager for FMCC. In the final analysis, the issue boils down to who the Court chooses to believe. Having had the opportunity to examine the witnesses' demeanor and manner of testifying, (see *Volis v. Puritan Life Ins. Co.*, 548 F.2d 895, 901 (10th Cir.1977), the Court chooses to believe, or give more weight to, the testimony of the Ford Tractor and FMCC personnel. Talcott's testimony was that he relied on the advice and guidance of various Ford zone personnel in keeping purchase option proceeds and in cannibalizing equipment to replace defective parts. The Court gives little weight to his testimony because Talcott did not name or call as witnesses any of his purported advisers. He admitted that none of FMCC's witnesses so advised him, although they included four Ford personnel with dominion over Olathe Ford: the Ford Tractor field sales manager and zone manager; and the FMCC branch manager and sales representative.

Furthermore, Talcott did not testify that he kept the proceeds of outright sales of new and used equipment because of advice from Ford personnel. Apparently he independently decided that he could keep these proceeds until FMCC caught on and demanded remittance.

Talcott testified that he always furrowed these monies back into Olathe Ford to relieve its worsening cash flow problem. He repeatedly blamed FMCC and Ford Tractor for Olathe Ford's shortage of cash and overage of inventory, and pointed out

that he and his family were the sole investors in Olathe Ford and lost substantial sums of money. This, he contended, justified his failure to remit proceeds to FMCC. The Court finds Talcott's excuses unacceptable. If Olathe Ford's cash problem was so severe, why did Talcott continue to pay himself a substantial salary? More importantly, why did he continue to charge Olathe Ford $1,200.00 to $1,500.00 a month for storage space in an otherwise unused barn? The monthly rent he charged for the barn was as much as Olathe Ford paid to rent its store. Finally, the Court must consider the inferences raised by the testimony of Charles Merritt, FMCC's private investigator. Merritt testified that the property taxes on the Talcott's farm were $21,850.80 in 1979 and $21,899.30 in 1980. Presumably, Talcott paid these taxes since he did not list them as debts in his schedules. Yet in 1979 the Talcott's only income was Mr. Talcott's $33,974.00 salary from Olathe Ford, and their farm lost $15,849.00 that year. (*Def.Ex. D*). In 1980 their only income was his $20,630.00 salary from Olathe Ford and their farm lost $31,223.00 that year. (*Def.Ex. E*). This evidence raises serious questions as to whether Talcott used proceeds for his personal expenses rather than for Olathe Ford expenses as he testified. The evidence is not conclusive; but taken together and examining all the circumstances, this Court finds an absence of honesty or justification for Talcott's failure to remit proceeds and for his cannibalization of inventory. The Court therefore, finds that Talcott's conduct was wrongful, excessive, deliberate and intentional, and constituted willful and malicious injury within the meaning of § 523(a)(6).

Accordingly the following obligations are nondischargeable: $35,173.00 in unremitted proceeds of new equipment; $43,262.00 in unremitted proceeds of purchase option equipment; $5,709.00 in unremitted proceeds of used equipment; and $823.00 in actual unremitted payments on an outstanding lease. FMCC also claimed $869.00 in estimated unremitted payments on an outstanding lease, but since the final status report (*Ct.Ex. # 1*) stated that FMCC would collect the $869.00 as an account receivable, the Court finds that FMCC is not entitled to collect the same sum from Talcott. FMCC also claimed a $10,120.00 loss on cannibalized inventory, deeming the inventory valueless as is. The Court finds that the inventory was not completely devalued because of missing parts. The uncontroverted testimony of Talcott was that the inventory could be made whole by putting the parts back on. Accordingly, the Court finds that Olathe Ford only sustained a $3,000.00 loss on cannibalized inventory. The total of Talcott's nondischargeable obligations is therefore, $87,967.00. However, this sum must be reduced by the dividend FMCC will receive through the Olathe Ford bankruptcy proceeding, $4,024.65. Thus, judgment is granted to FMCC for $83,942.35.

THIS MEMORANDUM SHALL CONSTITUTE MY FINDINGS OF FACT AND CONCLUSIONS OF LAW UNDER BANKRUPTCY RULE 752 AND RULE 52 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

## CERTIFICATE OF REVIEW

SAFFELS, District Judge.

The attached order has been certified by Bankruptcy Judge Benjamin E. Franklin under Rule 42(e)(2)(A) of the Local Rules of Court for this District. Upon review of the same in accordance with Rule 42(e)(2)(B) of said Local Rules, the undersigned hereby approves and adopts said order in its entirety including the findings of fact and conclusions of law therein contained.