In re John Albert SINDIC, Debtor.

WAUKESHA STATE BANK, Plaintiff,

v.

John Albert SINDIC, Defendant.

Bankruptcy No. 83–02345.
Adv. No. 83–1059.

United States Bankruptcy Court,
E.D. Wisconsin.

Nov. 9, 1984.

Donald Roy Fraker, Jastrock & LaBarge, Waukesha, Wis., for plaintiff.

James Beaudry, Beaudry & Beaudry, West Allis, Wis., for defendant.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

Waukesha State Bank ("Bank") seeks a judgment against John Albert Sindic ("debtor") declaring the sum of $17,286 to be a nondischargeable debt based upon §§ 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code.[1] The trial was held on July 12, 1984. The only testimony presented was that of the Bank. The debtor did not appear in person but was represented by his attorney.

### · FACTS

In 1979, the debtor commenced a business of purchasing and selling automobiles.[2] His method of operation was to purchase vehicles, either at public auctions or from insurance companies which had acquired vehicles damaged in accidents. Thereafter, the debtor made arrangements with the Bank to obtain funds sufficient to pay for these automobiles purchased. He would refurbish and then sell them to car dealers. Initially, the Bank required the debtor to exhibit certificates of title to the cars before any funds would be released. The Bank also required the debtor to execute security agreements. The certificates of title would then be returned to the debtor without any perfection of the Bank's security interest through recording with the Wisconsin Department of Transportation, due to the rapid turnover of the cars. It was the express understanding between the parties, however, that the proceeds from all sales would be promptly remitted by the debtor to the Bank to the extent required for full repayment on the loans covering the particular vehicles involved. Whatever proceeds remained after such repayment, could then be utilized by the debtor as he saw fit.

Eventually, a satisfactory working arrangement developed through passage of time, and the Bank no longer insisted that the debtor exhibit the certificates of title to it. All that would be required was for the debtor to provide the identification numbers for the vehicles he purchased which, in turn, would be inserted on the security agreements executed by the parties.

\* \* \* \* \* \*

1. § 523. EXCEPTIONS TO DISCHARGE.
 (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
 \* \* \* \* \* \*
 (2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
 (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

 (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

2. Debtor and the Bank had been transacting business since 1974. These earlier dealings, however, involved a series of personal loans. The first commercial loans between them occurred in 1979.

There were no trust agreements or any other written documents of any kind to define the operating procedure which was very loose and informal.

Between 1979 and 1982, the parties had 20 to 23 separate commercial transactions between them. The total amount which the debtor was obligated to pay to the Bank at any one time would vary from a low of $1,000 to a high of $25,000.

When the debtor filed his petition in bankruptcy on June 23, 1983, there were four separate outstanding loans with balances collectively totalling $17,286. These transactions are broken down as follows: [3]

a. Note and security agreement dated March 2, 1982 covering a $2,000 loan for the purchase of a 1979 Ford Fiesta. The outstanding balance is $1,477.80.

b. Note and security agreement dated September 3, 1982 for $4,279.50 covering proceeds claimed to have been received by the debtor from the sale of a 1979 Trans Am Pontiac and never remitted to the Bank. This is disputed by the debtor who, nevertheless, agreed to resolve the matter by executing a new note and security agreement for this amount. The same 1979 Ford Fiesta (listed in "a." above) also is collateral for this obligation. The outstanding balance is $3,240.15.

c. Note and security agreement dated March 9, 1982 for $8,256.22 representing a consolidation loan including $5,300.00 advanced for the purchase of a 1978 Buick Regal and 1978 Oldsmobile Regency and a separate loan for $2,300 covering the purchase of a 1978 Buick Regal. The outstanding balance on this consolidated loan is $8,852.19.

d. Note and security agreement dated October 29, 1982 covering a $6,400 loan for the purchase of a 1980 Cadillac Seville. The outstanding balance is $3,715.86.

By the time the debtor filed his petition in bankruptcy, all of the vehicles described above had been disposed of by the debtor without any sale proceeds being remitted to the Bank. No testimony was introduced as to when these cars were sold or what the debtor received from the sales. There was testimony that the sale proceeds had been used by the debtor to pay his expenses but it was not established if the expenses were solely for business obligations or were partially for business obligations and partially for personal obligations.

THE § 523(a)(2)(A) CLAIM

■ This exception to discharge is based upon false pretenses, false representations or actual fraud. It requires establishing the following elements:

1. That the debtor made the representations.

2. That at the time made, the debtor knew the representations to be false.

3. That the representations were made with the intention and purpose of deceiving the creditor.

4. That the creditor relied upon such representations.

5. That the creditor sustained the alleged loss and damage as a proximate result of the representations having been made.

*In re Vissers*, 21 B.R. 638 (Bankr.E.D.Wis. 1982).

■ The plaintiff has failed to establish all of these elements by the necessary quantum of proof of clear and convincing evidence. *In re Vissers, supra.* David Gramling, Assistant Vice President of the Bank, was the only witness who testified. He was personally familiar with all of the transactions with the debtor and acknowledged that the debtor never made any false statements in connection with any of these transactions. He also stated that what induced the Bank to continue to do business with the debtor was the debtor's past payment performance which showed that he

---

**3.** All outstanding balances include interest on all transactions computed through July 12, 1984 which was the date of the trial.

was paying on a timely basis. Two of the necessary elements under § 523(a)(2)(A): —representations made by the debtor; and reliance by the creditor—are therefore lacking. Accordingly, the Bank's attempt to declare this obligation nondischargeable under § 523(a)(2)(A) cannot be sustained.

### THE § 523(a)(6) CLAIM

 This exception to discharge contains the words "willful and malicious" in the conjunctive and both elements must be shown to exist. *In re Grace,* 22 B.R. 653 (Bankr.E.D.Wis.1982). As in *Grace,* the central issue is not whether the debtor's actions are willful. There can be no serious contention that the debtor's actions were anything other than willful. The real area of concern is whether the actions by the debtor were "malicious" within the meaning of § 523(a)(6). It is well settled that "malicious" does not require a finding of hatred, spite or ill-will. *Collier on Bankruptcy,* § 523.16(1) (15th Ed.). Beyond this, however, there is a division of authority among courts as to the meaning of "malicious" within the context of § 523(a)(6). Some courts have concluded that "malicious" requires an actual or conscious intention to harm. *In re Hodges,* 4 B.R. 513 (Bankr.W.D.Va.1980); *In re Nelson,* 4 C.B.C.2d 548 (N.D.Ill.1981). Other courts do not adhere to this test. They adopt the pre-Code definition set forth in *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904) where the Supreme Court stated that "malice" for purposes of the Bankruptcy Act meant implied or constructive malice resulting from a wrongful act intentionally and without just cause or excuse. *In re Wyant,* 80–1192 (Bankr.N. D.Ind.1981); *In re De Rosa,* 20 B.R. 307 (Bankr.S.D.N.Y.1982); *In re McCloud,* 7 B.R. 819 (Bankr.M.D.Tenn.1980); *In re Auvenshine,* 9 B.R. 772 (Bankr.W.D.Mich. 1981). This Court believes that the rationale of this latter line of cases is sound and accordingly adopts it.

 In the final analysis, a court must examine the facts of each case in order to determine if the debtor's actions were without just cause or excuse. In the case at bar, there was no testimony to support a finding that the debtor at any time had been authorized by the Bank to use the proceeds from the sale of the cars for his business or personal expenses before first paying off the loans covering those cars. To the contrary, the Bank's witness, Mr. Gramling, testified that on one occasion in 1980, after the debtor had used the proceeds from the sale of the car and had applied them toward the purchase of another vehicle, he was specifically admonished not to do this in the future. There was no evidence offered by the debtor to contradict Mr. Gramling's testimony regarding this arrangement. Mr. Gramling was a credible witness. He was forthright in acknowledging that the Bank did not supervise the debtor's account as well as it should have. He was also candid in admitting that the debtor never made any false statements which induced the Bank to advance the funds. The record is clear that the debtor had engaged in numerous loans transactions with the Bank over a period of approximately four years and fully understood the terms of their arrangement which was built upon mutual trust. He was no neophite to the business world by the time he entered into the particular transactions with the Bank which are involved in this case. The debtor knew that he was only entitled to keep such surplus as remained after the Bank was first paid its portion of the proceeds. He told Mr. Gramling, upon inquiry, that he was unable to sell the cars because they were not bringing the appropriate prices, when in fact, they had already been sold. These actions evinced a course of conduct by the debtor of untruthfulness and concealment. It is clear to this Court that the debtor knew he had expressly violated the terms of his agreement with the Bank. Bad business judgment on the debtor's part, coupled with a hope that he might eventually be able to "catch up and bail out", is not just cause or excuse. This is not a situation of a party acting honestly but under a mistaken belief that the funds could be used in this manner. Instead, it is similar to *In re Talcott,* 29 B.R. 874, 10 B.C.D. 734 (Bankr.D.Kan.1983) where the Court found that a debtor automobile dealer's conduct

was not based upon an honest belief engendered by a course in dealing that he could keep the proceeds and remit them to the financing company of the car manufacturer as his cash flow would permit. In *Talcott*, the Court accordingly held that the debt was nondischargeable. *See also, Matter of Klix*, 23 B.R. 187 (Bankr.E.D.Mich.S.D. 1982) where the Court made a finding that the debtor was a businessman experienced in selling automobiles who, in violation of a floor plan arrangement, concealed the sales of certain vehicles from the lender. The Court then held the debt to be nondischargeable.

The fact that the Bank did not duly perfect its security interest in the titles is no defense to the debtor. The procedure of not perfecting titles was adopted by the parties primarily as an accommodation to the debtor in order to expedite and facilitate prompt sales of the vehicles and to avoid delay which would otherwise take place in releasing liens on the titles following the sales. While a failure to perfect a lien may render such lien subordinate to the rights of third parties, as between the debtor and creditor, the security interest is valid and a debtor is estopped from denying its validity. *In re Rule*, 38 B.R. 37 (Bankr.D.Vt.1983); *Matter of Smith*, 16 B.R. 111 (Bankr.E.D.Wis.1981); *In re Schoenfeld*, 32 B.R. 9 (Bankr.S.D.Fla. 1983). The debtor's acts constituted a willful and malicious conversion of the Bank's security interest within the meaning of § 523(a)(6).

## DAMAGES

The remaining issue is the amount of the debt to be excepted from discharge. As previously noted, the record does not reveal what the debtor received from the sales of the collateral. The record also fails to divulge if the amounts received reflected the then current market values of the vehicles. The only portion of the debt which is nondischargeable is that amount which the creditor would have been entitled to had he been able to repossess the property and thereafter sell it. The balance of the debt is not for willful and malicious injury but is merely the result of a loan transaction and is discharged. *Matter of Ries*, 22 B.R. 343 (Bankr.W.D.Wis.1982); *In re Pommerer*, 10 B.R. 935 (Bankr.D. Minn.1981). Where the amount of the loss cannot be ascertained, it has been held under those circumstances that the entire balance of the debt be declared nondischargeable. *In re Ricketts*, 16 B.R. 833 (Bankr.N.D.Ga.1982). This Court is not presently satisfied that the amount of the loss is unascertainable. Accordingly, a hearing shall be held before this Court on December 18, 1984 at 9:30 A.M. in order to receive testimony as to the amount of damages resulting from the loss and to enable the debtor to produce evidence regarding the sums received from the sale of the collateral and how these proceeds compared with the market values of the vehicles. If the debtor fails to produce satisfactory evidence, the entire balance of $17,-286 shall then be declared nondischargeable.

This decision shall stand as and for findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.