In re Lewis J. **CLARK**, Fred L. Clark, Floyd L. Clark, Debtors.

**PRODUCTION CREDIT ASSOCIATION OF GRAFTON, Plaintiff,**

v.

**Lewis J. CLARK; Fred L. Clark; and Floyd L. Clark, Defendants.**

Bankruptcy Nos. 84–05411 to 84–05413. Adv. No. 84–7146.

United States Bankruptcy Court, D. North Dakota.

June 3, 1985.

Douglas Christensen, Grand Forks, N.D., for plaintiff.

John Moosbrugger, Grand Forks, N.D., for defendants.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

By a Consolidated Complaint filed on November 20, 1984, the Plaintiff, Production Credit Association of Grafton (PCA), seeks a determination that certain debts of the Debtors/Defendants, Lewis J. Clark, Fred L. Clark and Floyd L. Clark, are non-dischargeable under section 523(a)(2), 523(a)(4) and 523(a)(6). The matter was tried before the Court on April 30, 1985, and the parties have provided the Court with post-trial briefs. The Court finds the following facts material to resolution of the issues presented.

### FINDINGS OF FACT

Lewis Clark, age 53, and his sons, Fred, age 26, and Floyd, age 23, are jointly engaged in a potato farming operation. Lewis and his sons also are owners of a corporation known as Clark Potato Company organized for the purpose of marketing potatoes. Lewis is the person in charge of all marketing decisions for the family farming business and at trial Lewis and co-Defendants' counsel stipulated that Fred and Floyd would be bound by the Court's decision herein. As a part of the farming operation, each of the Clarks individually entered into Basic Loan Agreements with

PCA, and PCA thereafter advanced funds to them. On February 28, 1983, Lewis executed a Supplementary Loan Agreement acknowledging an outstanding indebtedness of $262,933.66 and pursuant to which PCA agreed to loan disbursements up to $341,265.00. Fred executed a Supplementary Loan Agreement on March 1, 1983, acknowledging an outstanding indebtedness of $80,192.00 and pursuant to which PCA agreed to loan disbursements up to $178,654.00. Floyd executed a Supplementary Loan Agreement on February 28, 1983, acknowledging an outstanding indebtedness of $87,485.00 and pursuant to which PCA agreed to loan disbursements up to $177,529.00. Testifying on behalf of himself and his sons, Lewis admitted that the supplementary loans have not been repaid. The present balance outstanding on the Lewis Clark loan is $296,837.00; on the Fred Clark loan, $65,060.00; and $83,733.00 on the Floyd Clark loan.

As security for the supplementary loans, Lewis in 1982 extended to PCA a security interest in: 1) all crops growing or to be grown on certain described land in Pembina County, North Dakota, and the products of such crops; 2) all accounts arising from the sale, lease or other disposition of collateral with disposition of collateral authorized conditioned upon PCA of Grafton being named as payee on all remittances for purchases of collateral with PCA receiving 100% of each remittance; 3) documents of title and warehouse receipts. · In 1983, a second security agreement was signed, again granting PCA a security interest in all crops and accounts arising from their sale or disposition with the further requirement that a sale name PCA as a payee on all remittances. In 1983, Fred and Floyd also signed security agreements extending to PCA the same security interest as had Lewis. PCA properly perfected its security interests by filing financing statements covering crops with the Register of Deeds for Pembina County. The security agreements are plain in their terms, and Lewis testified that with regards to the agreements he knew what he was signing, knew what secured property meant, knew that by the terms of the security agreements PCA had a lien in all 1983 crops which prevented him from selling them. He also acknowledged signing a notice required by North Dakota state law which specified that when grain subject to a PCA lien is sold, the purchaser must be advised of the lien and PCA's name must appear on the payment check. This notice further stated that failure to disclose the evidence of a lien would constitute a crime under state law. Lewis testified that he knew the sale of property secured to PCA could be a criminal offense in North Dakota.

In the fall of 1983, the Clark farm operation ran into a cash problem because certified potatoes contracted ring rot resulting in their rejection by various buyers. In order to obtain operating funds, Lewis in December 1983 began to sell off the 1983 potato crop which he admitted at trial was secured to PCA. At trial, he advanced the argument that a portion of the 1983 potatoes sold were not products of the Debtors' farm operation but rather were owned by the marketing entity, Clark Potato Company. He offered into evidence a recently prepared accounting of the 1983 crop disposition which showed that the total proceeds stemming from sale of the farm's 1983 potato crop was $226,290.43. Previously, Lewis had provided information to PCA regarding the extent of the sale of the 1983 farm potato crop, and PCA had gathered further information from the Debtors' bookkeeper. From these earlier admissions and sources, PCA calculated the total proceeds from the sale of the farm's 1983 potato crop to be $295,344.27. PCA's compilation of the extent of the farm's 1983 crop sold is more creditable as it is buttressed by the fact that in an earlier deposition, Lewis agreed to the accuracy of the PCA figures and during the deposition had specifically gone over PCA's accounting of the 1983 sales item by item. At trial, Lewis recanted his earlier accounting by claiming he had a problem with his bookkeeper. However, he agreed at trial that this same bookkeeper's listing of bills paid with sale proceeds was correct. The later account-

ing relied upon by Lewis at trial was prepared within ten days of trial and seems to the Court to be a recent attempt to cloud the true figures. The evidence in this regard is insufficient to establish that any of the 1983 crops sold came from any source other than the Debtors' farming operation. The Court believes and adopts as a finding of fact that the Debtors sold the farm's 1983 potato crop for a total of $295,344.27. The Court further finds that the entire sum rose from the sale and disposition of collateral secured to PCA. From the documents introduced into evidence, $137,171.34 of the proceeds have been properly accounted for by PCA. Lewis acknowledged that of the proceeds, $129,215.43 was used by him for expenses relating to the farm operation. Finally, $28,957.50 of the proceeds have not been accounted for to PCA and cannot otherwise be traced to any use. Of the proceeds used by Lewis in the farm operation, $22,456.08 went to pay an IRS levy, and $29,527.90 went towards satisfaction of a threshing and harvesting lien in favor of Lewis himself against work he performed in harvesting Fred and Floyd's 1983 potato crop. Another sum was paid to Clark Potato Company as a brokerage fee. By the instant action, PCA seeks to have the sum of $158,172.93 declared non-dischargeable. This amount is a combination of the proceeds used by Lewis in the farming operation and the $28,957.50 that was completely unaccounted for.

Lewis was advised by PCA as late as September 1983 that its name was to be on all checks, and at trial Lewis stated that he did not abide by the security agreements when he sold the 1983 crop, he did not advise the purchasers that PCA had a security interest in the crop he was selling, nor did he take any steps to see that PCA's name was placed on the checks. At trial, Lewis stated he knew PCA had a lien in the 1983 crops and knew he was required to obtain PCA's name on all checks. Lewis stated at trial that he intentionally violated his duty under the security agreements and took the money, using it to pay other bills as the records of his bookkeeper indicated. This sum is the $137,171.34. Despite these

admissions, Lewis said that it remained his intent to pay PCA back. He, however, did not further elaborate upon how or when this was to be accomplished.

## CONCLUSIONS OF LAW

Upon a careful review of the facts, it is evident to the Court that the elements necessary to except the debt from discharge under section 523(a)(6) of the Code have been met. For this reason, section 523(a)(2) and (a)(4) upon which PCA also premised its claim for relief will not be discussed.

■■■■ Section 523(a)(6) of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, or 1328(b) does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity, ...

11 U.S.C. § 523(a)(6). It is settled that the sale by a debtor of property subject to a security interest without payment of the debt secured thereby may constitute a willful and malicious injury satisfying the requirements of section 523(a)(6). *In re Rebhan*, 45 B.R. 609 (Bankr.S.D.Fla.1985); *Webster City Production Credit Ass'n. v. Simpson*, 29 B.R. 202 (Bankr.N.D.Iowa 1983). A mere technical conversion of secured property is not enough, however. The conversion must have been both willful and malicious. One without the other will not support a claim based on section 523(a)(6). The creditor seeking to have a debt declared non-dischargeable under this section has the burden of proving each of these elements by fair preponderance of the evidence. *In re Wightman*, 36 B.R. 246 (Bankr.N.D.1984). "Preponderance of the evidence" has recently been defined by the Eighth Circuit Court of Appeals as meaning the greater weight of evidence. *Smith v. United States*, 726 F.2d 428 (8th Cir.1984).

"It is the evidence which, when weighed with that opposed to it as more convincing force and is more probably true and

accurate. If upon any issue in the case, the evidence appears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then plaintiff has not met his or her burden of proof." *Smith*, supra. (citations omitted).

The Defendant/Debtors argue that PCA has failed in its proof both as to willfulness and maliciousness principally for the reason that Lewis indicated an intent to repay PCA. The element of willfulness means simply an intentional and deliberate action. *Matter of Langer*, 12 B.R. 957 (BD.C.N.D. 1981). In this regard, the evidence is clear that the Debtor, Lewis Clark, was aware of PCA's security interest in the 1983 potato crop and knew the import of that interest was that the crop could not be sold or disposed of contrary to the terms of the security agreement. His intent to disregard PCA's security interest and sell the secured crop irrespective of his knowledge of the security interest has been established by the facts and meets the willfulness requirement of section 523(a)(6).

■ The term maliciousness is less capable of precise definition and has always been a difficult concept for the courts. It has been construed as referring to a wrongful act done intentionally and without justification or excuse. *In re William D. James*, 42 B.R. 265 (Bankr.D.Ky.1984); *In re La Casse*, 28 B.R. 214 (Bankr.D.Minn. 1983). The *Langer* district court decision, in affirming the bankruptcy court, suggested that there must be a specific intent to harm the creditor. It also recognized, however, that a definition of malice is perhaps best left to the particular circumstances of each case. *Matter of Langer*, supra. at 960. As a concept, it has been said that "The search for malice is always a perplexing exercise, dealing as it does with a brooding malevolence, a private design for harm, from which society seeks protection in the law. Easy to deny and hard to prove, the secret state of mind may be laid bare, if at all, by a reference to the acts of its creator." *In re Cooney*, 18 B.R. 1011 (Bankr.W.D.Ky.1982). The foregoing quote from *In re Cooney* points up the conflict facing a court when defining the standard applicable to a finding of maliciousness. The Supreme Court in the leading case of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), eliminated the requirement of a particular malignant spirit or personal hatred as an element of malice and instead adopted a standard of constructive or implied malice. With the enactment of section 523(a)(6) came the widely accepted analysis of *In re Hodges*, 4 B.R. 513 (Bankr.W.D.Va.1980) and its progeny which interpreted the term "malice" to require a specific intent to do harm to the creditor personally. The *Hodges* court, in reaching this stricter standard, relied upon the case of *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) believing that *Davis* mandated such a construction. Our own bankruptcy court decisions have in the past been interpreted as defining malice as a specific intent to harm the creditor (*Matter of Langer*, supra.). By today's decision, this Court specifically overrules whatever vitality that theory had. Many courts have expressed disagreement with the *Hodges* case because the requirement of showing a specific intent on the part of a debtor to do harm is a nearly impossible burden of proof in conversion cases. *See Matter of Nelson*, 35 B.R. 763 (Bankr.N.D.Ill.1982) where the court, contemplating application of the *Hodges* standard, noted that it was difficult to imagine how a standard of specific intent to harm could ever be applied where secured property is wrongfully disposed of because malice is rarely an ingredient of the debtor's conduct in such situations. The bankruptcy court's decision in *Nelson* was appealed which provided the district court an opportunity to thoroughly analyze various standards of proof regarding maliciousness which had evolved since the *Tinker* decision. In a very well reasoned opinion, the district court examined the history of the willful and malicious exception of section 523(a)(6) and, agreeing with the bankruptcy court, felt that adoption of the "intent to do harm" standard would make it nearly impossible to prove malice except by the debtor's own admission and makes it

too easy for a debtor to avoid non-dischargeability after the conversion has occurred. *United Bank of Southgate v. Nelson*, 35 B.R. 766 (D.C.N.D.Ill.1983). Its research and analysis led the *Nelson* court to hold:

"[I]n the context of a debtor who sells encumbered property prior to the bankruptcy, "willful and malicious injury" means a deliberate or intentional act in which the debtor knows his act would harm the creditor's interest and proceeds in the face of the knowledge. The debtor's knowledge may be inferred from his experience in business, his concealment of the sales, his admission that he had read the security agreement which forbid the sale or that he understood what was meant by the term security agreement and collateral used as security."

To the extent that the bankruptcy court decision in *Langer* may have implied adoption by this Court of the strict *Hodges* standard, it is overruled. The Court believes the more appropriate standard to apply when defining malice in a conversion case is as enunciated in *United Bank of Southgate v. Nelson*. In the context of conversion by a debtor of secured collateral, malice is established by proof that the debtor acted with knowledge that the creditor's interest would be harmed as a consequence of the act.

 The evidence in this case clearly establishes that Lewis Clark deliberately failed to comply with the terms of the security agreements and in conscious disregard thereof disposed of collateral secured to PCA. Lewis' statement that he intended to pay PCA is always a convenient and occasionally a believable defense. In the instant case, however, this expressed intent is confuted by the fact that Lewis converted nearly $130,000.00 of the proceeds to his own purposes and was unable to satisfactorily explain what became of another $29,957.00 of the proceeds. A mere expression of intent in the face of inappropriate and irregular conduct is a meretricious defense particularly where that conduct is a conversion of encumbered property. Lewis Clark not only consciously disregarded PCA's security interest but then attempted to claim a priority interest in certain of the proceeds by personally asserting a harvest lien and then using converted funds to satisfy it. Beyond the security agreements themselves, Lewis was expressly warned by PCA prior to selling the potatoes that PCA's names had to be on all checks. The conversion occurred nonetheless.

The Court is satisfied from the totality of the evidence, and in particular in view of Lewis' conduct, that the second element of malice has been established which, when coupled with the element of willfulness, meets the requirements of non-dischargeability under section 523(a)(6).

The Court understands and sympathizes with the problems faced by the Debtors which gave rise to their actions, but a personal need for cash is never an acceptable basis under the law for a conscious disregard of a security agreement and disposal of collateral contrary to the interests of the secured creditor. Accordingly,

IT IS ORDERED that the sum of $158,172.93 owing by the Debtors to the Production Credit Association of Grafton is non-dischargeable under section 523(a)(6) of the Bankruptcy Code.

JUDGMENT MAY BE ENTERED ACCORDINGLY.