In re Clinton Ray GANTT, Debtor.

DOMINION NATIONAL BANK OF RICHMOND, a National Banking Corporation, Plaintiff,

v.

Clinton Ray GANTT, Defendant.

Bankruptcy No. 85–00235–R.
Adv. No. 85–0113–R.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Dec. 30, 1985.

A.C. Berkeley, Jr., Richmond, Va., for plaintiff.

Harry M. Johnson, Jr., Richmond, Va., for defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the Court on the complaint by the plaintiff, Dominion National Bank ("Dominion"), to determine the dischargeability of a debt owed by the defendant, Clinton Ray Gantt ("Gantt"), pursuant to 11 U.S.C. § 523(a)(6). Gantt filed an answer denying the allegation of Dominion and further alleging that Dominion violated Truth in Lending procedures under Federal Reserve Regulation Z. After the presentation of evidence, the issue of dischargeability of the debt was taken

under advisement, as well as the issue regarding violation of Regulation Z.

## FINDINGS OF FACT

In order to purchase a convenience market in Powhatan County, Virginia, known as the "County Line Convenience Store," the debtor, Clinton R. Gantt, on October 15, 1982, applied for and received a $10,000 loan from the plaintiff, Dominion National Bank of Richmond. The loan was evidenced by a three month note in the same amount. To secure the loan, Dominion took back a security interest in the inventory and equipment in the store, the security interest subsequently being perfected by the filing of financing statements with the Circuit Court of Powhatan County and the State Corporation Commission ("SCC"). By agreement between Dominion and Gantt, only the interest on the note would be due and payable in three months, with similar notes being executed at three month intervals, until at the end of one year a new note in the original loan amount would be executed providing for payment of principal and interest over an extended period of time.

The evidence showed that the new three month notes were entered into in January, April, and July of 1983 with the final three month note expiring on October 1, 1983. The evidence and testimony indicated that at each time a new note was signed, the note was secured by the original security agreement and financing statement dated October 15, 1982. Although the July 1983 note was not produced at trial, the parties agreed that that particular note was executed along with the accompanying security agreement. The financing statement originally filed in October 1982, which covered the three month notes, expired on October 15, 1983.

On October 21, 1983, Gantt signed a note providing for the payment of the original note's principal and the accrued interest over 48 months at payments of $286.22 a month. Although there was conflicting testimony as to the extent the note terms had been inserted in the note at the time

Gantt signed, the Court finds through the testimony of Dominion's loan officer, W. Robert Micheaux, that at the time the note was signed, it did in fact provide for adoption of the security agreement entered into in October 1982. It was the October 1982 security agreement that covered the inventory and equipment of the convenience store.

As the financing statement covering the original security agreement expired on October 15, 1983, a new financing statement had to be filed for the note of October 21. Dominion, rather than filing a new financing statement immediately, waited until Gantt paid $10.00 to cover the filing fees required by the Powhatan Circuit Court and the SCC. Evidence was introduced that on October 31, 1983, Gantt's wife came into the Bank and paid $11.36 to cover an overdraft on the couple's checking account and she also paid the $10.00 necessary to cover both filing fees. On that same day, Dominion issued checks to the SCC and the Circuit Court of Powhatan County, and it mailed the checks to the respective filing authorities along with the new financing statements. The financing statement filed in Powhatan County was marked, "Continuation—Original Still Effective," even though the original expired on October 15, and the financing statement mailed to the SCC was also marked as a continuation statement. However, the aforesaid mark was crossed out on the SCC form, and it was filed as an original. Both financing statements were duly filed on November 3, 1983.

Additionally, on October 31, Gantt entered into an agreement with Mr. and Mrs. Herbert W. Cumbea (the "Cumbeas") to sell, for $15,000, the business known as County Line Convenience Store. The evidence was contradictory as to when Gantt signed the agreement allowing the Cumbeas to purchase the property, as Gantt stated he did not sign until the note was paid in full. Mr. Cumbea testified that Gantt signed the agreement within a few days of October 31. It is without dispute, however, that the Cumbeas went into pos-

session of, and began operating the business, on October 31, 1983. In accounting records kept by Mrs. Gantt, identified as plaintiff's Exhibit No. 7, the purchase of the business was consummated on October 31, 1983, with the down payment due on November 7, 1983. The down payment, along with other additional expenses, was received from the Cumbeas, by check, on November 8, 1983. The Court makes a finding of fact that Gantt executed the agreement in October, 1983 and that the transfer of title to the business and of Dominion's collateral took place on October 31, 1983.

Wayne Aylor, Dominion's Manager for the area where Gantt took out the loans, testified, as did loan officer Michaeux, that Gantt did not mention his intention to sell the business, and thereby Dominion's collateral, nor did Gantt obtain Dominion's consent. Gantt's deception continued after the sale as he applied for a loan at Dominion to purchase a truck in January 1984, and in his application he listed his employer as County Line Convenience Store. Also, in the same month, Gantt cashed checks for his employees at Dominion and he indicated that he had someone working for him at the store in order to enable him to pursue his firewood selling operation. Dominion's awareness of the sale occurred in mid-1984.

Gantt made nine monthly payments on the note of October 21, 1983, until he defaulted leaving a balance due of $8,847.60 in principal, plus interest of $746.39. Gantt filed a petition under Chapter 7 of the Bankruptcy Code on February 22, 1985 seeking to discharge, among other debts, the amount due Dominion, which was listed as being unsecured. Gantt testified that he did not think that the debt was secured because he thought the new loan of October 21 was a "personal" loan. In addition, Gantt further stated that the loan papers were not filled out when he signed them; however, Gantt's testimony was strongly contested by Dominion. The Cumbeas were not advised of the note owing to Dominion nor its security interest in the inventory and equipment of the convenience store.

## CONCLUSIONS OF LAW

### I. *Regulation Z*

■ With regard to the plaintiff's alleged noncompliance with Federal Reserve Board Regulation Z, it should be noted that extensions of credit for business or commercial purposes are exempted from the regulation. *See* 12 C.F.R. § 226.3(a). Among the articulated factors to be considered in determining whether a transaction is primarily for business purposes are the following: (1) the relationship of the borrower's primary occupation to the acquisition, (2) the degree to which the borrower will personally manage the acquisition, (3) the ratio of the income from the acquisition to the total income of the borrower, (4) the size of the transaction, and (5) the borrower's statement of purpose for the loan. *Thorns v. Sundance Property*, 726 F.2d 1417 (9th Cir.1984).

■ The Court finds that the loan to Gantt from Dominion was primarily for a business or commercial purpose. Gantt's primary occupation once the purchase of the County Line Convenience Store took place was as its owner and proprietor, and there is no doubt that during the first year of operation, the Gantts were personally managing and operating the convenience store as an on-going concern.

Although the testimony did not indicate the exact proportion of the income the convenience store provided to Gantt, given the fact that he was at times also involved with a service station and a firewood business, the business purchased with the loan from Dominion provided a substantial portion of his income. The size and stated purpose of the loan also support the contention that the loan was for a business purpose, as Gantt did in fact tell Dominion that he was going to use the loan proceeds to purchase the convenience store. Additionally, the fact that Gantt later put the loan on an installment basis would not take it out of a commercial purpose transaction, particularly in light of Dominion's lack of knowledge

of Gantt's sale of the business as is hereinafter discussed.

For the foregoing reasons, the Court finds that Regulation Z does not apply to the transaction between Gantt and Dominion.

## II. *Tortious Conversion*

A plaintiff seeking a debt to be held nondischargeable under § 523(a)(6)[1] for conversion must establish a tortious conversion has occurred. *In re Hazelwood*, 43 B.R. 208, 213 (Bankr.E.D.Va.1984). Further, "if the plaintiff can meet that burden, then he must also demonstrate that the conversion was willful and malicious." *Id.* Each element of the case must be proven by clear and convincing evidence. *In re Criswell*, 52 B.R. 184, 204 (Bankr.E.D.Va. 1985).

This Court has previously held that the conversion for dischargeability purposes which must be proven is "an act of dominion or control wrongfully asserted over another's property inconsistent with his ownership of it ... [I]t is essential that [the] plaintiff show that the converted item is indeed [his] property." *Hazelwood*, 43 B.R. at 213. *See Matter of Lambillotte*, 17 B.R. 256, 258 (Bankr.M.D.Fla.1982). Thus, the question in this case is whether or not Gantt's sale of the inventory and equipment of County Line Convenience was inconsistent with the ownership rights of Dominion, if in fact Dominion had ownership rights.

In *In re Scotella*, 18 B.R. 975 (Bankr.N. D.Ill.1982), a debtor financed the purchase of a boat, and the lender took back a chattel mortgage security interest in the boat to secure repayment. The debtor subsequently sold the boat without the lender's permission, and the Court held that as a security agreement granted the lender the right to possess the boat if a default occurred under the note, the sale of the boat without the lender's knowledge or consent

was "inconsistent with [the lender's] rights under its security agreement and note." Therefore, the debtor had tortiously converted the lender's property to his own use. *Id.* 18 B.R. at 976.

Also in support of this position is *In re Clark*, 50 B.R. 122 (Bankr.D.N.D.1985). In *Clark*, the debtor was a farmer who, in order to obtain financing, gave a security interest in his crops and the accounts receivable generated from their sale. The debtor subsequently sold the crops and used the proceeds to meet his general farming expenses, rather than turning over any of the funds to the secured party. It was held that "it is settled that the sale by a debtor of property subject to a security interest without payment of the debt secured thereby may constitute a willful and malicious injury satisfying the requirements of § 523(a)(6)." *Clark*, 50 B.R. at 125.

Although a mere technical conversion, or an innocent assumption of dominion and control, is not sufficient to warrant a tortious conversion under the Bankruptcy Code, *Hazelwood*, 43 B.R. at 213, such is not the case here. As in *Scotella*, the debtor in this proceeding, Gantt, disposed of property that was the subject of a security interest. As Dominion would have had the right to take possession of the inventory and collateral if the note fell into default, Gantt's sale of the property without Dominion's knowledge or consent interfered with and was inconsistent with Dominion's property rights under the security agreement and note.

■ The fact that Dominion did not duly perfect a security interest in the inventory and equipment is of no assistance to Gantt. While failure to perfect may render a lien subordinate to the rights of third parties, as between a debtor and a creditor, the security interest is binding and a debtor is barred from denying its validity. *In re Sindic*, 44 B.R. 167, 172 (Bankr.E.D.Wis.

---

1. 11 U.S.C. § 523(a)(6).

A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

1984); *In re Cardillo,* 39 B.R. 548 (Bankr. D.Mass.1984). The court in *Sindic* held that a debtor's unauthorized sale of automobiles in which the creditor had an unperfected lien gave rise to actionability under § 523(a)(6). *Sindic,* 44 B.R. at 172. In other words, the existence of a security agreement between the debtor and a creditor, although invalid as against third parties, gives rise to a property right which can be converted.

Having established that Dominion's collateral was the subject of an unauthorized disposition, giving rise to a conversion actionable under § 523(a)(6), Dominion must prove that the injury to its property was willful and malicious. This Court has consistently held that "willful" means "deliberate or intentional." *In re Hazelwood,* 43 B.R. 208, 213 (Bankr.E.D.Va.1984); *In re White,* 18 B.R. 246, 248 (Bankr.E.D.Va. 1983). Indeed, the vast majority of courts across the country have adopted this interpretation. *See In re Clark,* 50 B.R. 122, 126 (Bankr.D.N.D.1985); *In re Krause,* 44 B.R. 159, 162 (Bankr.N.D.Ill.1984); *United Bank of Southgate v. Nelson,* 35 B.R. 766, 768 (D.C.N.D.Ill.1983); *Matter of Ries,* 22 B.R. 343, 346 (Bankr.W.D.Wis.1982); *In re Fussell,* 15 B.R. 1016, 1022 (D.C.W.D.Va. 1981). The Court finds that Gantt deliberately and intentionally sold the collateral to the Cumbeas. The evidence adduced at the hearing shows that Gantt was well aware of his actions, and the sale of the inventory and equipment was an intended result of the consummated deal.

For an injury to property to be "malicious" under § 523(a)(6), it must be a wrongful act done without just cause or excuse, and it need not be motivated by hatred, ill will, or spite. *In re Hazelwood,* 43 B.R. 208, 213–214 (Bankr.E.D.Va.1984). In the context of an unauthorized disposition of secured property, this Court is in accord with *In re Krause,* 44 B.R. 159, 162 (Bankr.N.D.Ill.1984), which held that a malicious injury can be shown by an act which the debtor is aware will harm the creditor's interest, and the debtor proceeds with that knowledge. *See also United Bank of Southgate v. Nelson,* 35 B.R. 766, 776 (D.C. N.D.Ill.1983); *Matter of Ries,* 22 B.R. 343, 347 (Bankr.W.D.Wis.1982).

There is a distinction between the intent to do harm and the knowledge that harm will occur. While the intent to do harm is not a necessary element for a finding of maliciousness under § 523(a)(6), the knowledge that harm will occur, and proceeding in the face of that knowledge, is sufficient to buttress an allegation of maliciousness. With regard to the conversion of secured property, among the articulated factors from which the debtor's knowledge of the consequences of his act can be inferred are: (1) the debtor's experience in business; (2) concealment of the transaction; and (3) an admission that the debtor read and understood the security agreement. *Krause,* 44 B.R. at 162; *Nelson,* 35 B.R. at 776; *In re Cardillo,* 39 B.R. 548, 550 (Bankr.D.Mass.1984).

In this case, Gantt operated the County Line Convenience Store for a full year with the security interest riding on his inventory and equipment. He testified that at the time he entered into a security agreement in October of 1982 he knew the inventory and equipment stood as collateral for his initial loan. Gantt was not inexperienced with loan transactions as he stated that he had been dealing with Dominion and Aylor for a period of approximately twenty years. It was clear that his business sophistication was such that he would understand the basic elements of a security agreement.

Gantt did not inform Dominion of the sale of inventory and equipment, even after there was ample opportunity to do so. The evidence showed that Gantt came into Dominion in January of 1984, several months after the collateral was disposed of, and he did not mention the sale of the business. In fact, Michaeux testified that he asked Gantt how the convenience store was doing, and how he found time to be involved in other enterprises given the fact that Gantt also operated a service station and a firewood business. Gantt replied that he "had a boy running [the store] for him," according to Michaeux. At no time was

Dominion told, or otherwise made aware of the fact, that the sale had taken place and when the opportunity to do so presented itself upon inquiry about the business, such information was not made available. Aylor testified that he was finally apprised of the sale of the property in mid-1984.

In addition, Gantt applied for a loan at Dominion on January 26, 1984 in order to purchase a truck, and on the loan application Gantt stated that his present employer was the County Line Convenience Store. Gantt did not list any income received from County Line Convenience as being rent or payment on an installment note by a purchaser, but instead he merely indicated the store was his employer. It would be logical for Dominion to maintain the impression that Gantt still owned the store and that its collateral was protected.

Gantt did admit that he read the security agreement of October of 1982 and that he understood the extent of the security agreement. However, Gantt testified that the October 21, 1983 note was blank when he signed it. Michaeux, whose testimony the Court finds to be the more persuasive, stated with some emphasis that he explained the terms of the note to Gantt, and that he specifically outlined the fact that the original collateral was being retained as security for the present note. The language of the note is clear and unambiguous. Even if Gantt may not have fully understood the language of the note, which is doubtful, he also signed a standard UCC–1 financing statement on the same day, which was marked as a continuation of the prior security agreement. Given the fact that Gantt has signed similar documents in the past, it would seem clear that he understood what the document was there for.

■ In summation, the Court finds that Gantt knew the import of the documents signed on October 21, 1983, and he was aware that the inventory and equipment of the convenience store stood as collateral for his debt. Furthermore, given the need for such documents, it is clear that Gantt was in a position to know that Dominion would be left with an unsecured note when he sold the collateral. Therefore, on the facts before the Court, it must be found that Gantt's actions constituted a willful and malicious injury to the property of another. The property was sold intentionally and deliberately, without just cause or excuse, and with the knowledge that Dominion would be harmed by the sale of the collateral. Although intent to do harm is not the operative element of "malicious" and § 523(a)(6), the knowledge of the transaction's import and Gantt's sale of the property in the face of such knowledge, leads the Court to the conclusion that the debt is not dischargeable in bankruptcy.

### III. *Damages*

■ As a general rule, the amount of a debt which will be held nondischargeable in bankruptcy due to a conversion under § 523(a)(6) is the lesser of the value of the converted property or the amount of the indebtedness. *In re Boren*, 50 B.R. 315, 316 (Bankr.W.D.Ky.1985); *In re Ricker*, 26 B.R. 862, 864 (Bankr.E.D.Tenn.1983). However, "when wrongful conduct has rendered difficult the precise damages suffered by the party affected, the best available evidence before the court is sufficient to fix the amount of damages." *Ricker*, 26 B.R. at 864.

In *Ricker*, the debtor purchased video equipment in which the seller took back a security interest. The debtor subsequently sold the collateral to "unknown" persons, and he never remitted the proceeds of the sale to the secured party. The court, on the evidence before it, could not make a determination as to the value of the collateral lost or the precise damages to the secured party. *Ricker*, 26 B.R. at 864. However, the court found through the debtor's testimony that he received approximately 60 percent of the retail sales price for the video equipment, and judgment was entered in that amount. *Ricker*, 26 B.R. at 865. As *Ricker* stated, citing *Cline v. Rountree*, 236 F.2d 412 (6th Cir.1956), "[a] defendant whose wrongful conduct has rendered difficult the ascertainment of the

precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision that otherwise would be possible." *Ricker*, 26 B.R. at 865; *Cline*, 236 F.2d at 413.

The evidence in the present case indicates that Gantt received $15,000.00 for the sale of the County Line Convenience Store, with no breakdown as to the value of the equipment or inventory in which Dominion held its security interest. As the Court cannot make an exact determination as to the value of the collateral when it was disposed of by Gantt, and the Court cannot say that the value is less than the indebtedness due Dominion, judgment should be entered in the amount of $9,593.99.

An appropriate Order will issue.