In re John NOVAK, Debtor.

In re John LATTIMORE, Debtor.

Mark MEDVED, Gilbert Hellmer and Columbine Limited 1979 E, A Colorado Limited Partnership, Plaintiffs,

v.

John NOVAK and John Lattimore, Defendants.

Bankruptcy Nos. 84–40378, 84–40379. Adv. No. 84–0167.

United States Bankruptcy Court, D. Kansas.

May 18, 1987.

Michael R. Roser, Berman, DeLeve, Kuchan & Chapman, Kansas City, Mo., Steven B. Doering, Cole & Doering, Garnett, Kan., for plaintiffs.

John M. Novak, Paola, Kan., pro se.

John Lattimore, Paola, Kan., pro se.

Larry E. Schneider, Topeka, Kan., trustee.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

This adversary proceeding is before the Court on the objections of plaintiffs Mark Medved, Gilbert Hellmer and Columbine Limited 1979 E, a Colorado Limited Partnership (Columbine) to discharge of certain debts owed them by defendants/debtors, John Martin Novak and John Edward Lattimore. Plaintiffs' complaint seeks judgment for actual and punitive damages in an amount exceeding $2,000,000, under sections 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6) of title 11 of the Bankruptcy Code. Trial was to the Court and the matter was submitted on testimony and exhibits; judicially-noticed portions of the proceedings for stay relief and appointment of trustee in a

related bankruptcy case, *In Re Mid–States Energy Corporation*, No. 84–40256; the proofs of claim filed by Medved and Hellmer in Novak's and Lattimore's bankruptcy cases; the transcript of certain proceedings for an accounting in the District Court of Johnson County; and on plaintiffs' and defendants' proposed findings of fact and conclusions of law.

Plaintiffs Medved and Hellmer appear in person and, along with plaintiff Columbine, by their attorneys Michael R. Roser of Berman, DeLeve, Kuchan & Chapman, and Steven B. Doering, Cole & Doering. Defendants appear pro se.

The Court, having reviewed the voluminous record, is now ready to rule.

### Background

At the threshold, it is helpful to set forth the general background of this matter. This case involves a series of limited partnerships syndicated by Novak and Lattimore for investment in oil and gas. Novak and Lattimore were majority shareholders, directors and officers of one of the general partners to the partnerships, Mid–States Energy Corporation. Novak, acting as an individual, also was a general partner in two limited partnerships, Kansas Crude Oil 1977, and Kansas Exploration 1978 (these two, along with Mid–States Exploration 1977, are hereinafter called the "Johnson County Partnerships"). Mid–States Energy alone acted as general partner in a fourth limited partnership, 1979 Rantoul Oil Project (Rantoul).

Plaintiffs Medved and Hellmer are engineers and partners in an engineering firm. From 1977 through 1978, they invested large sums of money and became limited partners in the Johnson County Partnerships. They later became shareholders of Mid–States Energy. In 1979, Medved, Hellmer and Columbine subscribed and became limited partners in Rantoul. After their investments soured, plaintiffs forced liquidation and accounting of the Johnson County partnerships, and defendants filed for bankruptcy.

Plaintiffs' allegations in this matter revolve around two patterns of conduct on defendants' part. First, plaintiffs generally contend that defendants mismanaged the Johnson County Partnerships and Rantoul by improperly charging and commingling the various capital accounts of the partnerships, and by selling Rantoul's principal asset. This conduct is alleged to constitute fraud and defalcation under § 523(a)(4) and malicious injury under § 523(a)(6). Second, plaintiffs contend that defendants fraudulently induced their investments in Rantoul and Mid–States Energy Corporation under § 523(a)(2)(A) and (B). With that as background, the Court finds the facts as follows:

### FINDINGS OF FACT

1. Novak and Lattimore are directors, officers and majority shareholders of Mid–States Energy Corporation (Mid–States Energy), each owning 45% of the common stock. [The other shareholder, owning 10%, is not involved in this proceeding.]

2. In 1977 Mid–States Energy and Novak as general partners syndicated a Kansas limited partnership called Kansas Crude Oil 1977 Drilling Program (Kansas Crude 1977). Hellmer and Medved each invested $100,000 in Kansas Crude 1977 to become, along with other unknown parties, limited partners thereof.

3. Also in 1977, Mid–States Energy alone as general partner syndicated a Kansas limited partnership called Mid–States Exploration 1977 Oil Program (Mid–States Exploration 1977). Hellmer invested $20,000 and Medved invested $50,000 to become, along with other unknown parties, limited partners thereof.

4. In 1978, Mid–States Energy and Novak as general partners syndicated a third Kansas limited partnership entitled Kansas Exploration 1978 Drilling Program (Kansas Exploration 1978). Medved and Hellmer each invested $400,000 to become, along with other unknown parties, limited partners thereof.

5. Medved's investment in the Johnson County Partnerships totalled $550,000; Hellmer's totalled $520,000. [The other

plaintiff, Columbine, did not invest in the Johnson County Partnerships.]

6. The partnership agreements of the Johnson County Partnerships contained several relevant provisions. First, the purpose of the partnerships was to "explore for, produce, treat, transport and market either oil or gas, or both, or products derived therefrom, anywhere in the United States...." (Partnership Agreement, ¶ 3.1) Second, the general partners agreed to contribute to the various partnerships leases owned by Mid–States Energy, in exchange for the general partners' interest in the partnership. The leases were to be held either in the name of the partnerships or in the name of Mid–States Energy as nominee (¶ 3.1(n)). Third, the general partners agreed to deposit each of the partnership's funds in separate bank accounts and not to commingle partnership funds with funds of the general partners (¶ 5.1). Fourth, the general partners were granted control over the management, business and affairs of the partnerships (¶ 10.1), and agreed to undertake unlimited liability (¶ 10.11). Fifth, the general partners agreed to operate the wells on partnership leases for a supervisory fee at rates per month per well "no higher than those normally charged in the same or a comparable geographic area ...," but in any event not to exceed $125.00 [ (¶ 11.1). Sixth, the allocation of costs among partners was agreed to be as follows:

6.1 Costs and expenses incurred in drilling, testing, equipping and completing Partnership Wells will be allocated and charged as follows:

(a) Non-capital costs will be charged ninety-nine (99%) to the limited Partners' accounts and one percent (1%) to the General Partnership Account; and
(b) Capital costs will be charged to the General Partner's account unless the capital costs attributable to a particular well exceed fifty percent (50%) of the total costs incurred in drilling and completing such well, in which case the capital costs charged to the General Partnership account will be limited to fifty percent (50%) of the total cost and the remaining capital costs will be

charged to the Limited Partners' accounts.

\*　　\*　　\*　　\*　　\*　　\*

6.2 All costs and expenses incurred by the Partnership that are not allocated by the terms of Section 6.1 above, including operating costs, ..., the portion of the General Partner's general overhead and administrative expense attributable to the Partnership and all other costs and expenses of the Partnership will be charged as follows:

(a) Fifty percent (50%) to the Limited Partner's account; and
(b) Fifty percent (50%) to the General Partner's account.

[In Mid–States Exploration 1977 alone, the percentage allocation was 75% to the Limited partners' account and 25% to the general partners.] [¶ 6.1] "Capital" and "noncapital" costs were elsewhere defined. (¶ 2.1[y], [z]). Next, productive "wells" were defined as "wells that are producing or capable of producing oil and gas in quantities sufficient to yield a return in excess of operating costs." (¶ 2.1[o]). Eighth, the agreements provided that "[t]he aggregate Paid–In Subscription will be expended for costs incurred by the Partnership that, in accordance with the terms of this Agreement, are properly chargeable to the Limited Partners' accounts." (¶ 5.2). Ninth, the general partners were not to contract to sell all or substantially all of the partnership properties without the prior consent of limited partners whose aggregate percentages exceed fifty percent. (¶ 10.12).

7. Throughout the time periods in question, and contrary to the partnership agreements, Novak and Mid–States Energy (1) did not contribute the leases to the partnerships but used partnership funds to purchase the leases; (2) held the leases in their own name and not as nominee; (3) commingled all partnership funds in Mid–States Energy's account; (4) charged a well supervisory fee of $150.00; and (5) improperly charged the partners' capital accounts, although defendants' CPA had approved the accountings each year after internal audits.

The customary well supervisory charges during this time were also $60.00 to $90.00.

8. Although there were distributions to the partnerships from oil production revenue in unknown amounts in 1977, 1978 and 1979, oil production revenue was not as promising as plaintiffs had hoped. [Hellmer estimated he had received $100,000 for his $520,000 investment.]

9. In August, 1979 defendants approached plaintiffs about investing in a new Kansas limited partnership, the 1979 Rantoul Oil Project (Rantoul). Mid–States Energy was the sole general partner. Defendants presented plaintiffs with a Private Placement Memorandum dated August 3, 1979 in which they represented that the general partner would assign to the partnership two leases, the H. Caylor North "A" lease (Caylor North), and the H. Caylor South lease (Caylor South). The placement memorandum also stated as follows:

> There is an exploratory well recently drilled by the General Partner, on the Caylor North "A" Lease, *having production* from the Peru and Squirrel Sands. A second exploratory well on the Caylor North "A" lease drilled by the General Partner *produced* from the Peru, Squirrel, and Bartlesville sands. Finally, the General Partner is drilling a test well on the H. Caylor South Lease, which well offsets to the north, a well producing from the Squirrel sands. (See Exhibit C, which contains a geologic report on the H. Caylor North "A" Lease and the H. Caylor South Lease ...)
>
> The General Partner agrees that it will drill and complete one (1) new well for each Twenty–Five Thousand Dollars ($25,000) of Aggregate Paid–In Subscription contributed to the Partnership by the Limited Partners. The first three (3) wells to be completed will be the test wells now initiated on the H. Caylor North "A" Lease (two wells) and the H. Caylor South Lease (one well). (emphasis added)

10. Defendants also represented orally to plaintiffs that the Caylor North wells were producing wells.

11. At the time plaintiffs invested in Rantoul, defendants' oral and written representations that the Caylor North wells were producing wells was false; the two wells were neither producing nor productive within the meaning of the Rantoul private placement memorandum, but were non-producing.

12. Defendants knew that their representations were false, and intentionally failed to disclose those facts to plaintiffs when plaintiffs invested in Rantoul.

13. Plaintiffs relied on the misrepresentation that the wells were producing in making their investments in Rantoul, and would not have invested had they known the wells were not capable of producing.

14. From August, 1979 through December, 1979 Medved and his wife invested $50,000,[1] Hellmer invested $100,000 and Columbine $110,000 to become, along with other parties not involved here, limited partners in Rantoul. The total capital subscription of all limited partners was $500,-000.

15. The Rantoul partnership agreement was substantially the same as those of the Johnson County Partnerships, except that the allocation of expenses and income among the general and limited partners was 25% and 75%. [The partnership agreement is not in the record.]

16. After drilling the two wells mentioned in the placement memorandum, defendants did not drill any more wells on the Caylor North lease.

17. Defendants drilled 20 wells on the Caylor South lease from August, 1979 through January, 1980.

18. In December, 1979, defendants approached Medved about selling some drilling rigs, pumps, and diesel engines in order

---

**1.** The documentary evidence such as checks and partnership accountings list Medved and his wife as one partner. However, because there is no testimony that Medved's wife held any share of the partnership interest, and since Medved's testimony is that it was his investment, the Court finds that for purposes of this proceeding Medved owned all the interest of the limited partnership share attributed on Rantoul's books to him and his wife.

to raise capital for Mid–States Energy. Medved eventually bought the equipment and leased it back to Mid–States Energy.

19. A report prepared by geologist John Hickox dated June 10, 1980, concerning the Caylor North lease stated that Mid–States Energy had drilled two wells which were "now await[ing] completion." The report predicted that the two wells would produce 183,150 barrels of oil over the next twelve years, and opined that at $40.00 per barrel, "further development of the field was most attractive."

20. Sometime in 1980, Medved and Hellmer became preferred shareholders of Mid–States Energy by investing $400,000 each.

21. Also in 1980, Rantoul made a distribution of $50,900.00 to the partners, according to the "Statement of Partners' Capital Year Ended December 31, 1980." The accounting for plaintiffs was shown as follows:

| | Balance 12–31–79 | Share of Income | Distributions | Balance 12–31–80 |
|---|---|---|---|---|
| Gilbert F. Hellmer | $ 99,395.41 | $1,273.30 | $12,725.00 | $ 93,320.54 |
| Columbine | 109,334.95 | 1,716.14 | 8,398.50 | 102,652.59 |
| Mark P. & Dorothy V. Medved | 49,697.71 | 780.06 | 3,817.50 | 46,660.27 |

No distributions were paid in 1981 or 1982.

22. In February, 1982 meetings of the preferred shareholders of Mid–States Energy and of the limited partners were held. A decision was reached to actively seek the sale of some of the leases held by the limited partnerships. At the meeting, defendants promised the Rantoul limited partners that their capital contributions would be repaid from the sale proceeds.

23. Medved called defendants frequently from February through July, 1982 asking about the progress of the search for buyers for leases.

24. In May, Medved received a letter from Novak, dated May 20, 1982 stating:
We are continuing our efforts to obtain firm, reasonable offers on the partnership properties and will notify you of same.

25. Sometime between May and July, 1982 defendants sold the Caylor South lease to Inco Resources for $350,000.

26. Defendants did not disclose to the Rantoul limited partners in advance that they were going to sell the Caylor South lease to Inco Resources.

27. Defendants deposited the $350,000 sale proceeds in an account of Mid–States Energy and shortly thereafter used the money to pay operating expenses and secured and unsecured debts of Mid–States Energy and of Mid–States Petroleum, Inc., a related corporation in which defendants were involved.

28. At the time defendants sold the Caylor South lease, the Bank of Commerce in Tulsa, Oklahoma had threatened to foreclose Mid–States Energy's mortgages and another group of creditors had threatened involuntary bankruptcy.

29. Defendants sold the Caylor South lease to save their own corporation from financial ruin, and willfully and deliberately proceeded knowing that harm would result to the Rantoul partnership.

30. In late July or August, 1982 defendants told Medved they had sold the Caylor South lease and spent the money.

31. Defendants knew at the time they sold the lease and spent the money that the limited partners were entitled to a 75% allocation of the proceeds, since the limited partners' capital contributions had not been repaid.

32. During August, 1982, defendants met with Medved and Hellmer and their attorney and accountant. Defendants disclosed that Mid–States Energy was in severe financial trouble. Defendants discussed giving the Rantoul partnership a note for $400,000 secured by a ½ interest in defendants' lease, the Everhardt South.

Medved and Hellmer rejected that idea as it would entail unfavorable tax consequences.

33. The negotiations resulted in Medved and his accountant, Terrence Merrigan, spending 2½ months at the offices of Mid–States Energy supervising defendants' operation of the partnerships. During that time, Medved encouraged defendants to expend funds to drill new wells, so that flush production and increased cash flow could be received.

34. On December 21, 1982 defendants held a meeting of the Rantoul limited partners in order to seek ratification of the sale of the Caylor South lease. Defendants read the partners a memorandum that stated:

As you are aware, 1979 Rantoul Project in Kansas, a Kansas Limited Partnership, had as its most substantial asset, an Oil and Gas Lease dated March 22, 1979, with respect to property known as the Caylor South Property. As the result of the efforts of Mid–States Energy Corporation, the General Partner in Rantoul, that Lease was able to be sold to Inco Resources, Inc., in a transaction with very favorable results to Rantoul.

A meeting is being held on December 21, 1982, to formally apprise the limited partners of the status of Rantoul. As the result of the financial circumstances of Energy, the transaction was effected in such a way that the Rantoul Limited Partners were able to receive in exchange for Caylor South Lease an asset of substantially more value than either Caylor South or the price paid for it by Inco. At the same time, the transaction permitted Mid–States and its affiliated entities to continue operating as going concerns.

Specifically, the transaction was effected as follows:

On May 14, 1982, Energy acquired 20% of the working interest in an Oil and Gas Lease with respect to property commonly known as Everhardt South.

35. A majority of partners at the meeting voted not to ratify the "proposed" trade of Caylor South for Everhardt South.

36. Before the partnership meeting, defendants obtained a proxy from Henry A. Kugeler, Jr., representative of Columbine, by falsely stating that only a proposed swap was under consideration, and by omitting that defendants had already sold and spent the proceeds of the Caylor South lease.

37. Despite having failed to obtain ratification by a majority vote of the partners, defendants in March, 1983 recorded an assignment from Mid–States Petroleum to Rantoul of a 20% interest in a 87½% working interest in the Everhardt South. There is no evidence in the record as to the value of that lease, although the Rantoul partnership income tax returns treated the sale as like-kind exchange.

38. In the interim, Medved and Hellmer decided to salvage their interests by obtaining control of all partnerships. In February, 1983 they formed a corporation entitled M & H Oil Company, which bought out the other limited partners' interests, except one, in the Johnson County Partnerships.

39. After the exchange of the Everhardt lease for the Caylor South lease, one distribution of $12,000 was made to the Rantoul partnership from oil production income, of which $9,000 went to the limited partners and $3,000 went to Mid–States Energy [Columbine received $1,980.00]. All the limited partners cashed their distribution checks except Medved and Hellmer.

40. On January 28, 1983, Medved and Hellmer as M & H Oil, the majority partner, notified Novak and Mid–States Energy that the three limited partnerships would be terminated. Plaintiffs eventually appointed Kenneth Holeman as liquidating trustee of the Johnson County Partnerships.

41. On February 25, 1983 Mid–States Energy executed an operating agreement with the Johnson County Partnerships. The agreement was signed by Novak as president of Mid–States Energy and by Novak as general partner.

42. Contrary to the terms of the partnership agreements, the operating agreement was not a standard form operating agreement.

43. On March 15, 1983 Novak and Mid–States Energy filed a declaratory judgment action against Holeman as trustee in Johnson County District Court. They sought an order determining the validity of the operating agreement. The Johnson County Court designated Holeman an officer of the Court and gave him possession of the Johnson County partnerships' oil and gas leases for the duration of the liquidation.

44. Also in March, 1983 Medved and Hellmer filed suit against Mid–States Energy and defendants in Miami County District Court, alleging fraud in the solicitation of their investments in Rantoul and conversion of Rantoul's principal asset.

45. On July 2, 1983 Medved and Hellmer sought leave to intervene in the Johnson County declaratory judgment action, asserting a counterclaim against Novak and Mid–States Energy, and a third-party claim against Lattimore. Both claims alleged fraud, breach of fiduciary duty, and violations of the Kansas Consumer Protection and Securities Acts in defendants' operation and control of the Johnson County Partnerships. That Court granted the motion to intervene.

46. On March 29, 1984 Mid–States Energy filed for bankruptcy (Case No. 84–40256). On April 19, 1984, this Court modified the stay to allow the two state court lawsuits to proceed against Mid–States Energy.

47. On April 30, 1984 both Novak and Lattimore filed for bankruptcy (Case Nos. 84–40378 and 84–40379, respectively). Shortly thereafter, this Court modified the stay to allow the two state court lawsuits to proceed against Novak and Lattimore.

48. On May 19, 1984 Hellmer and Medved moved in Mid–States Energy's bankruptcy case for removal of the debtor-in-possession and appointment of trustee. After a lengthy hearing, the Court found that the evidence clearly and convincingly showed cause to supplant the debtor-in-possession with a trustee. The Court based its decision on the following pertinent facts:

(a) that Mid–States Energy represented in the Rantoul offering literature that two productive wells had been drilled when, in fact, at the time the limited partners invested, Mid–States Energy was aware that neither well justified further drilling; and that Mid–States Energy's failure to disclose that fact led investors to rely on offering literature that was out of date and misleading;

(b) that Mid–States Energy charged a $150 per month per well supervisory fee in contravention of the partnership agreements;

(c) that Mid–States Energy commingled funds for the limited partnership in contravention of the partnership agreements; and that therefore some partnerships had credits which were uncollectible as a result of that breach of duty;

(d) that the Caylor South lease had been held in the name of Mid–States Energy and not as nominee, and had been sold without prior authority of the limited partners;

(e) that Mid–States Energy attempted to ratify the sale with a proxy from Columbine's representative of questionable validity; and

(f) that Everhardt South, the replacement lease, had produced distributions of $28,000 in oil production income since December, 1982 of which $12,000 was distributed, $12,000 was misappropriated, and $4,000 was on deposit in a commingled account, all of which was not indicative of great value in the replacement lease.

49. On July 13, 1984 plaintiffs filed this consolidated complaint objecting to discharge in Novak's and Lattimore's bankruptcy cases and seeking actual damages in excess of $2,000,000 and punitive damages in excess of $10,000.

50. On October 31, 1984 Honorable Herbert Walton of the Johnson County, Kansas District Court issued a decision approving the final accounting of the liquidating trustee of the Johnson County Partnerships. In a lengthy and well-reasoned opinion, Judge Walton found as follows:

(a) that during the course of operations of the three partnerships, the costs incurred by the partnerships were not

property charged to the accounts of the separate partners as required and specified by the partnership agreements;

(b) that during the course of operations of the three partnerships funds from the aggregate paid-in subscription were expended for costs which were not properly chargeable to the limited partners' accounts, contrary to the partnership agreements;

(c) that when costs incurred by each of the three limited partnerships were properly charged according to the terms of the partnership agreements, the accounting demonstrated that the general partners failed to sufficiently pay for costs chargeable to them and the limited partners paid for costs not properly chargeable to them;

(d) that in each of the 3 partnerships, the general partners received cash as proceeds from oil production which they failed to pay to the limited partnerships but kept and used to their own benefit and profit and which they owe to the limited partnerships;

(e) that the general partners owed the following amounts to the limited partnerships for cash proceeds received and retained by them:

(a) to Kansas Exploration 1978 Drilling Program—$32,345.00

(b) to Kansas Crude Oil 1977 Drilling Program—$21,253.18

(c) to Mid–States Exploration 1977 Oil Program—$15,364.12;

(f) that the general partners owed the following amounts to the limited partnerships for costs incurred by the partnership which were chargeable to the general partners but which were not paid by them.

to Kansas Exploration—$208,000

to Kansas Crude Oil—$62,000

to Mid–States Exploration—$22,517.00;

(g) that the limited partnerships owed to the limited partners the following amounts for expenditures made from the paid-in subscriptions for costs which were not properly chargeable to the limited partners:

From Kansas Exploration 1978—$398,-000

From Kansas Crude Oil—$91,000

From Mid–States—$30,000;

(h) that the liabilities of the limited partnerships to the limited partners in the above amounts were debts of the partnerships which were payable out of the assets of the partnerships prior to any distribution of assets to the partners; and

(i) that the liabilities of Mid–States Energy and Novak were debts to and receivables of the limited partnerships and were collectible as assets of the partnerships.

51. The decision of Judge Walton, insofar as it interprets the partnership agreements and finally accounts among the limited partners, is a final decision binding on this Court, as defendants did not pursue an appeal.

52. There is no evidence in the record as to the state courts' final decisions on plaintiffs' fraud and conversion claims asserted either in the Johnson County lawsuit or the Miami County lawsuit (concerning Rantoul).

53. Pursuant to the Johnson County Court's decision liquidating the partnerships, the liquidating trustee on July 31, 1985 made the following assignments of accounts receivable to Medved and Hellmer:

To Hellmer:

(1) $12,586.65 of accounts receivable due Mid–States Exploration 1977;

(2) $57,111.90 of accounts receivable due Kansas Crude Oil 1977; and

(3) $178,473.39 of accounts receivable due Kansas Exploration 1978.

To Medved:

(1) $37,758.38 of accounts receivable due Mid–States Exploration 1977;

(2) $57,111.90 of accounts receivable due Kansas Crude Oil 1977; and

(3) $178,473.39 of accounts receivable due Kansas Exploration 1978.

All assignments included interest at 15% per annum from and after July 31, 1985.

The stated purpose of the assignment was "to convey to the assignee his proportionate share all of the right, title and interest in the receivables due the assignee of [e.g.,] Kansas Exploration 1978 Drilling Program, a now fully liquidated and dissolved limited partnership."

54. Medved and Hellmer at the time of the dischargeability trial had not tried to collect the receivables, but opine that the assignments have no value.

55. On November 12, 1985 Medved and Hellmer (not Columbine) filed proofs of claim in Novak's and Lattimore's bankruptcy cases "for an amount in excess of $2,000,000." Medved and Hellmer stated that "the nature and amount of debts that Novak and Lattimore owe are set forth in the Johnson County action, Mid–States Energy Corporation, et al, v. Kenneth E. Holeman, No. 119840, and Gilbert F. Hellmer, et al v. Mid–States Energy Corporation, et al, No. 83–C–85."

56. On June 23, 1986 Novak and Lattimore received their discharge in bankruptcy with the exception of the debts complained of in the instant proceeding.

### ISSUES

I. Whether defendants procured plaintiffs' investments in the Johnson County Partnerships, Rantoul and Mid–States Energy Corporation by false pretenses, a false representation or actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

II. Whether defendants procured plaintiffs' investments in the Johnson County Partnerships, Rantoul and Mid–States Energy Corporation by means of a materially false written statement concerning the defendants' financial condition within the meaning of 11 U.S.C. § 523(a)(2)(B).

III. Whether defendants' actions in selling the Caylor South lease and in commingling funds of the partnerships constitute a defalcation or fraud while acting in a fiduciary capacity within the meaning of 11 U.S.C. § 523(a)(4).

IV. Whether defendants' actions in selling the Caylor South lease and in commingling funds of the partnerships constitute a willful and malicious injury to plaintiffs' property within the meaning of 11 U.S.C. § 523(a)(6).

### CONCLUSIONS OF LAW
#### *§ 523(a)(2)(A)*

Plaintiffs Medved and Hellmer contend that defendants solicited their investments in the Johnson County Partnerships, in Mid–States Energy Corporation, and in Rantoul by means of fraud and thus that their debts should be nondischargeable under § 523(a)(2)(A). In addition, plaintiff Columbine contends its investment in Rantoul of $110,000 was obtained by means of fraud.

Title 11 U.S.C. § 523(a)(2)(A) excepts from discharge debts

for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ...

■ The elements of § 523(a)(2)(A) are: (1) that debtor knowingly committed actual fraud, false representations, or false pretenses; (2) that debtor intended to deceive the creditor; (3) that the creditor reasonably relied on debtor's conduct; and (4) that the creditor was damaged as a proximate result. *In Re Ridgway*, 24 B.R. 780, 784 (Bankr.D.Kan.1982). An exception to discharge under § 523(a)(2)(A) is construed narrowly, and the burden of proving that the debt falls within the elements of the section is on the party opposing discharge. *In Re Black*, 787 F.2d 503, 505 (10th Cir. 1986). The proof must be by clear and convincing evidence. Moreover, § 523(a)(2)(A) includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise in the absence of bad faith or immorality. *In Re Black*, 787 F.2d at 505; *In Re Ridgway*, 24 B.R. at 784.

■ In this case, the Court first concludes that plaintiffs Medved and Hellmer presented no evidence concerning any actu-

al fraud on the part of defendants that might have caused them to invest in either the Johnson County Partnerships or in Mid–States Energy Corporation. At one point during the trustee removal hearing there was a suggestion by plaintiffs' attorney that Mid–States Energy made certain fraudulent statements in its preferred stock offering. However, plaintiffs made no attempt to follow up the suggestion with any testimony concerning the purported fraud. In the absence of any direct evidence on the issue, plaintiffs' complaint for determination of nondischargeability of their investments in the Johnson County Partnerships and Mid–States Energy must be denied.

■ As to plaintiffs' investments in Rantoul, however, the Court is compelled to reach a different conclusion.

The issue here boils down to whether defendants knew at the time plaintiffs invested in Rantoul that the offering literature as well as defendants' oral statements were false insofar as they represented that the two wells on the Caylor North lease were producing wells. Plaintiffs claim that defendants represented in the memorandum and in person that the Caylor North wells were "proven and producing." Defendants counter that they only represented that the wells were "productive"; that the wells were "productive" within the meaning of the partnership agreement at the time plaintiffs invested; that after initially drilling the wells on Caylor North, they did not test the wells for productivity because they had to drill 20 wells on the Caylor South, which wells were more promising than the Caylor North wells; and that defendants did not discover until after they returned to drill on Caylor North and after all partners had invested that the wells on Caylor North were neither productive nor producing. The Court cannot believe defendants' version of events.

First, the documentary evidence belies defendants' assertion that they represented only that the Caylor North wells were productive. The Rantoul limited placement memorandum describes the wells as "having production" and "produced." Defen-

dants conceded at the dischargeability hearing that they knew the offering literature erroneously described one well as producing, but they contend they relied in good faith on an erroneous geologist's report. The problem with this argument is that the only geologist's report in the record bears a date of almost a year after these events transpired. The Court simply cannot believe that defendants, who drafted the memorandum, were unaware of the error in terminology describing the wells' productive capacity. The Court therefore concludes that plaintiffs established the first element: that defendants knowingly made a false representation that the Caylor North wells were producing.

The next issue is whether defendants intended to deceive plaintiffs to procure their investment in Rantoul with the false representation that the wells were producing. The Court concludes they did. The Court finds nothing in the partnership agreement that required defendants to drill all 20 wells on the Caylor South before returning to the Caylor North. The Court thus cannot believe that defendants in good faith were forced to wait to test the productive nature of the Caylor North wells until after all the limited partners had subscribed. The Court finds it more likely that defendants, having drilled the Caylor North wells, knew they were losers, and conveniently refrained from testing them until all the limited partners' subscription money was safely in the bank. A court is not required to accept a debtor's unsupported assertions of an honest intent in the face of the natural inference from admitted facts. *In Re Ashcraft*, No. 85–12157, Adv. No. 86–0075 (Bankr.D.Kan. Mar. 5, 1986) (Pearson, J.). The Court therefore concludes that defendants acted with an intent to deceive plaintiffs in procuring their investment.

The next element is whether plaintiffs reasonably relied on defendants' false representation. Medved, Hellmer and Mr. Kugeler as a representative of Columbine all testified that, were it not for the statement that the Rantoul wells were proven, they would not have invested in Rantoul. Al-

though the other partnerships' return had disappointed Medved and Hellmer, they still had no reason at that point to disbelieve defendants, whose questionable business practices had not yet come to light. The Court concludes that plaintiffs relied on defendants' false representation, that the Caylor North wells were producing, and that their reliance was reasonable in light of all the circumstances.

Finally, the fourth issue is whether plaintiffs were proximately damaged as a result of defendants' conduct. The Court concludes that plaintiffs lost their investments as a proximate result of their reliance on defendants' false representation. The extent of plaintiffs' damages will be discussed below.

### § 523(a)(2)(B)

Plaintiffs next contend that their investments in the Johnson County Partnerships, Rantoul and Mid–States Energy were procured by means of a materially false writing respecting defendants' and their corporation's financial condition. Because plaintiffs did not present evidence on this ground or include it in their proposed findings of facts and conclusions of law, the Court finds that plaintiffs have abandoned this element of their claim, and that their complaint as to this ground should be denied.

### § 523(a)(4)

■ Next, plaintiffs assert that Novak's and Lattimore's debt to them should be excepted from discharge under § 523(a)(4), for fraud or defalcation while acting in a fiduciary capacity. Plaintiffs assert that defendants committed four acts of fraud or defalcation for which the debts should be nondischargeable: (1) that defendants sold the principle asset of the Rantoul partnership, the Caylor South Lease, and used the proceeds for their own purposes, without authorization of the partnership; (2) that defendants improperly charged more than $519,000 to the limited partners' capital account; (3) that defendants failed to account for some $68,000 worth in cash belonging to the Johnson County Partner-

ships; and (4) that defendants used $292,517.00 worth of funds of the limited partnerships to pay for items that were chargeable to the general partners' accounts.

Title 11 U.S.C. § 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, or embezzlement or larceny." This section has been interpreted to mean that fraud or defalcation are actionable only if the debtor was a fiduciary of the creditor, whereas embezzlement or larceny are actionable whether or not the debtor was a fiduciary. *In Re Talcott*, 29 B.R. 874 (Bankr.D.Kan. 1983) (Franklin, J.). Under § 523(a)(4) the plaintiff has the burden of proof to establish two elements: (1) that debtor was a fiduciary of creditor; and (2) that while a fiduciary, debtor committed a defalcation or fraud. *In Re Cowley*, 35 B.R. 526 (Bankr.D.Kan.1983) (Franklin, J.).

The term "fiduciary capacity" has not been defined by the Code. However, most cases have held that the question of fiduciary status under § 523(a)(4) is a question of federal law, although state law is an important factor in determining when a trust relationship exists. *In Re Black*, 787 F.2d 503 (10th Cir.1986). It is well settled under federal law that the term fiduciary capacity speaks of technical trusts, and not those that the law implies from contract. As stated in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934), "it is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*." In other words, the United States Supreme Court in *Davis* clearly established that the trust must have existed prior to the wrongdoing from which the debt arose.

In this case, plaintiffs assert that defendants were accorded a fiduciary capacity by operation of K.S.A. 56–321(a). That section provides:

> Every partner must account to the partnership for any benefit, and hold as trustee for it any profit derived by him or her without the consent of the other partners from any transaction connected with the formation, conduct, or liqui-

dation of the partnership or from any use by him or her of its property.

The Court cannot agree that this section made defendants fiduciaries within the meaning of § 523(a)(4).

First, there is no evidence that defendant Lattimore was a partner of any of the partnerships here involved. Thus, K.S.A. 56–321 by its terms does not apply to him, and does not apply to Novak insofar as he was not a partner of Rantoul or Mid–States Exploration 1978. Although Lattimore and Novak were officers and directors of one of the general partners, Mid–States Energy, under Kansas law they owed a fiduciary duty only to the corporation and to its shareholders, not to the corporation's creditors or to these plaintiffs as limited partners. *In Re Cowley*, 35 B.R. 526 (Bankr.D. Kan.1983). *See also In Re Black*, 787 F.2d 503 (10th Cir.1986); *In Re Decker*, 36 B.R. 452 (D.N.D.1983).

The Court recognizes that two of the plaintiffs, Medved and Hellmer, were preferred shareholders of the corporation of which Novak and Lattimore were officers and directors. However, plaintiffs did not present any evidence that Novak's or Lattimore's actions in commingling funds and converting partnership assets damaged Mid–States Energy Corporation, which evidence would give rise to claim of breach of corporate fiduciary duty. The Court concludes that plaintiffs have failed in their burden to establish that Lattimore was a fiduciary to these plaintiffs, or that Novak was a fiduciary in two of the limited partnerships.

However, since Novak was a partner in Kansas Crude 1977 and Kansas Exploration 1978, it is appropriate to consider whether K.S.A. 56–321 may apply to him for purposes of § 523(a)(4).

As a general rule, courts will find the requisite express or technical trust when a state statute defines the relationship as a trust, or when the relationship has the typical attributes of a trust. *In Re Talcott*, 29 B.R. at 878. In *In Re Lipke*, 54 B.R. 704, 706, the court set out three elements that a state statute must meet in order for a fiduciary capacity to arise under the stat-

ute's operation. Those elements are: (1) that the trust res must be defined by the statute; (2) that the statute must spell out the fiduciary duty; and (3) that the statute must impose a trust on funds prior to the act creating the debt. In *Lipke*, the court found that an administrative regulation requiring insurance agents to remit commission proceeds to the insurance company from which the policies were sold did not create a fiduciary status on the part of the insurance agent because the three elements were not met within the terms of the regulation.

Upon superficial analysis, K.S.A. 56–321 appears to impose upon all partners a § 523(a)(4)-type fiduciary duty to account for profits. Two cases, involving identical partnership statutes in other states, have without any discussion indeed so held. *In Re Owens*, 54 B.R. 162 (Bankr.D.S.C.1984); *In Re Kraus*, 37 B.R. 126, 130 (Bankr.E.D. Mich.1984). Nonetheless, K.S.A. 56–321 makes the trust arise only when the partners derive profits without the consent of the partnership. The trust created is therefore that sort of trust *ex maleficio* which is not included within the purview of § 523(a)(4). Accord *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986); *In Re Hurbace*, 61 B.R. 563, 566 (Bankr.W.D.Tx. 1986). In other words, the statute does not create the trust without reference to the alleged wrongdoing, i.e., the partner's use and appropriation of partnership property without the consent of the partnership. See *Matter of McCraney*, 63 B.R. 64, 67 (Bankr.N.D.Ala.1986). See also held *In Re Miller*, No. 79–11918, Adv. No. 80–0124 (Nov. 15, 1982) (Pusateri, J.), (holding that partners are not fiduciaries of the partnership under Kansas law and under K.S.A. 56–321). Therefore, K.S.A. 56–321 alone cannot serve as the basing for imposing a fiduciary duty upon Novak under § 523(a)(4).

In *Ragsdale*, the Ninth Circuit had before it the California partnership statute, which is identical to K.S.A. 56–321. The Court there also concluded that that statute alone did not create the fiduciary capacity required by § 523(a)(4). However, the

Ninth Circuit went on to say that California case law, apart from the statutory law, had raised the duties of partners beyond those required by the literal wording of the statute. California case law had said that partners were trustees for each other in all proceedings in connection with the partnership and were required to act in good faith. The Ninth Circuit thus reasoned that, because those cases created more than just a fiduciary relationship in response to some wrongdoing, California had made all partners trustees within the meaning of § 523(a)(4) over the assets of the partnership.

In this case, plaintiffs have cited the Court no cases which impose a fiduciary duty above and beyond that created by K.S.A. 56–321. It is clear that under Kansas law partners are general agents for the other partners provided they act within the scope of the partnership business (*Brown v. Dye*, 165 Kan. 507, 195 P.2d 607 (1948)), and that partners, in the management of the partnership, owe each other a duty of good faith and ordinary care. *Carlin v. Donegan*, 15 Kan. 495, 500 (1875). However, this Court finds no cases that raise the level of good faith required to that of a fiduciary, and the Kansas Supreme Court has expressly held that partners are not fiduciaries within the meaning of the former section 17 of the Bankruptcy Act of 1898, upon which § 523 is based. *Inge v. Stillwell*, 88 Kan. 33, 127 P. 527 (1912). The Court therefore concludes that plaintiffs have failed to sustain their burden of proof that Novak as general partner was acting within a fiduciary capacity within the meaning of § 523(a)(4) at the time he committed the various alleged wrongdoings.

### § 523(a)(6)

Next, plaintiffs assert that defendants' acts constituted conversion, which would make their debts nondischargeable under § 523(a)(6). Plaintiffs allege that defendants (1) converted the Caylor South Lease; (2) converted money of the limited partners' capital accounts in the amount of ·$519,000; (3) converted the $68,922.00 in cash that the Johnson County Court found

unaccounted for; and (4) converted $292,-000 in expenses of the partnership funds that should have been chargeable to the general partners. Defendants, on the other hand, contend that they acted without malice or ill will as those terms are used in common understanding; that their sale of the Caylor South Lease was intended to salvage and preserve the limited partners' interest in the limited partnerships but that the bad oil market meant they could not fulfill their intentions; that they relied on a CPA in their charging of various capital accounts; that they didn't misappropriate the $68,000 but instead spent the money on the drilling of additional wells at the direction of plaintiff Medved; and that the Johnson County decision which established that defendants had improperly charged the various capital accounts is erroneous but that they could not afford to appeal it.

Section 523(a)(6) operates to make nondischargeable any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Generally, courts have held that "willful and malicious" requires intentional doing of an act which necessarily leads to injury. *In Re Franklin*, 726 F.2d 606, 610 (10th Cir.1984). "Willful" has been more specifically defined as deliberate or intentional. *In Re Talcott*, 29 B.R. 874, 879 (Bankr.D. Kan.1983). "Malicious", on the other hand, has been defined as "wrongful, excessive, or without just cause" and malice will be found even in the absence of personal hatred, spite or ill will. *In Re Talcott*, 29 B.R. at 879. This Court has also recognized that malice may be shown by a debtor's knowledge that his act will harm a creditor and the debtor's nonetheless proceeding in the face of that knowledge. *In Re Dorman*, 98 B:R. 560 (Bankr.D. Kan.1987) (Pusateri, J.).

 In this case the Court concludes that defendants' sale of the Caylor South Lease and the use of its proceeds constituted willful and malicious injury to the property of another within the meaning of § 523(a)(6). The Court finds simply incredible defendants' insistence that they sold

the lease under a good faith belief that they were authorized to sell it and that by selling it they intended to salvage the limited partners' interests. First, Defendants drafted the partnership agreements and are held to an understanding of their terms. Nowhere in the partnership agreements does it say that the general partner may sell assets of the partnership without authorization and nowhere does it say that the general partner can spend the money on the debts of the general partner or on the debts of an unrelated corporation. Next, defendants belief that they could salvage the partnerships' interest is belied by the fact that they spent money on the debts of Mid–States Petroleum Corp., a corporation owned by defendants but not even affiliated with the limited partnerships, and that they spent money on other nonpartnership debts. In fact, none of the debts of Rantoul were paid with the proceeds and no proceeds went into Rantoul's account. Rather, the evidence was undisputed that the Caylor South Lease was the principle asset of the Rantoul partnership; that it was the only lease with producing wells; and that its sale devastated the ability of the Rantoul partnership to earn any money whatsoever. Moreover, the fact that defendants tried later to ratify the improper sale at a meeting of all the limited partners held in December, 1982 shows that they did not think they had the authorization to sell the lease at the time they sold it. Even at that meeting, they did not disclose all relevant facts to the limited partners and obtained the proxy of at least one limited partner by misrepresenting exactly what they had done. In short, the Court finds defendants, in selling the Caylor South Lease and in spending the assets, intended to save their own corporation from financial ruin and willfully and deliberately proceeding knowing harm would result to Rantoul.

The case plaintiffs rely on, *In Re Zumwalt*, 53 B.R. 277 (Bankr.D.Ore.1985), is remarkably similar. In that case, the limited partner and the receiver of the partnership objected to the discharge of the debtor, the general partner. The evidence showed that the general partner had with-drawn money from the partnership to satisfy some of his personal debts. The court in that case held that the general partner's diversion of funds constituted an embezzlement and conversion under § 523(a)(6).

The Court therefore concludes that plaintiffs have sustained their burden of proof under § 523(a)(6) as against both Novak, acting as the general partner, and against Lattimore who, although acting through the corporation Mid States Energy, personally participated in the tortious conversion of the Caylor South Lease. *Patrons State Bank and Trust Co. v. Shapiro*, 215 Kan. 856, 861–62, 528 P.2d 1198 (1974). See also *Matter of Wholesale Furniture Mart, Inc.*, 24 B.R. 240, 243 (Bankr.W.D.Mo.1982); *Matter of Transport Clearings–Midwest, Inc.*, 16 B.R. 890 (Bankr.W.D.Mo.1979). The issue of damages will be discussed below.

As to the other alleged acts of conversion (the commingling and improper charging against capital accounts), however, the Court finds the plaintiffs have failed to sustain their burden of proof that these defendants committed the acts with the requisite willful and malicious intent. It is true that a good faith belief that one has authority to dispose of property will vitiate an allegation of willful and malicious conversion. The Court finds somewhat credible defendants' story that they relied on their CPA in making charges against the various capital accounts, and that they commingled accounts in order to save delay time in transferring funds. At most, the Court finds that defendants acted in reckless disregard of the partnership agreements, but the reckless disregard standard is no longer applicable under § 523(a)(6). *In Re Compos*, 768 F.2d 1155, 1158 (10th Cir.1985). See also S.Rep. No. 97–139, 97th Cong., 1st Sess. 523, 1981, U.S.Code Cong. & Admin.News 1981, 396.

## DAMAGES

■ The final issue concerns the amount of the debt that should be nondischargeable. Plaintiffs have not attempted to set forth an accounting of their complete loss, so the Court has had to sift through the

voluminous record to determine plaintiffs' actual damages. However, the Court finds that plaintiffs have introduced sufficient evidence to provide a trier of fact with an intelligent means in determining an appropriate damages award without speculation or conjecture. See *Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 301 (10th Cir.1987). Plaintiffs have therefore not failed in their burden of proof on this issue. The Court finds it curious, however, that having obtained stay relief for the purpose of allowing the state court to determine the extent of defendants' liability on the conversion and fraud claims, that plaintiffs have not introduced into evidence any decision thereon. This Court is therefore free to determine the extent of plaintiffs' damages and the portion of those damages that will be nondischargeable.

In fraud cases, Kansas generally follows the "benefit of the bargain" rule in determining damages in a case in which a plaintiff keeps the property he was fraudulently induced to purchase. *K-B Trucking Co. v. Riss Intern. Corp.*, 763 F.2d 1148, 1159 (10th Cir.1985). Under the benefit of the bargain rule, the defrauded purchaser may recover as damages the difference between the actual value of the property at the time of sale and the value it would have had had the representations been true. *Fisher v. Mr. Harold's Hair Lab, Inc.*, 215 Kan. 515, 527 P.2d 1026 (1974). Bankruptcy courts are split, however, on whether to apply the "benefit of the bargain rule" or the "out-of-pocket rule" as the measure of damage in dischargeability cases involving fraud. See *In Re Zumwalt*, 53 B.R. 277, 279 (Bankr.D.Ore.1985); *In Re Fasulo*, 25 B.R. 583 (Bankr.D.Conn.1982). By contrast, in conversion cases the converter is liable for the fair market value of the property at the time of the conversion.

In this case, plaintiffs seek as damages both a return of their investments in Rantoul and an amount representing their proportionate share in the tortiously converted Rantoul asset, the Caylor South lease. The problem is that these two types of wrongs call for different measures of damages, which, if allowed in full, would grant plaintiffs double recovery. Accordingly, the Court rejects the contention that plaintiffs should be entitled to in effect rescind the purchase of their limited partnership interest by the return of their investment yet still request damages for the conversion as though they were partners. The Court holds as follows:

First, applying the out-of-pocket rule,[2] the Court finds that plaintiffs are entitled to a return of their Rantoul investments, minus any amounts distributed to them as income, as follows:

1. To plaintiff Columbine, $100,672.59, equalling $102,652.59 [Capital balance 12–31–80], minus $1,980 [22% share of $9,000 Everhardt South distribution of 1983], plus prejudgment interest at the statutory rate calculated on (a) $110,000 from the date of investment to 12–31–80; (b) on $102,652.59 from 1–1–81 to the date of the Everhardt South distribution; and (c) $100,672.59 from the date of that distribution to the date of this judgment.

2. To plaintiff Hellmer, $93,320.54 [Capital Balance 12–31–80], plus prejudgment interest at the statutory rate calculated on the cumulative amounts invested from the respective dates of investment until 12–31–80; and (b) on $93,320.54 from 1–1–81 to the date of this judgment.

3. To plaintiff Medved, $46,660.27 [Capital Balance on 12–31–80], plus prejudgment interest at the statutory rate calculated on the cumulative amounts invested from the respective dates investment until 12–31–80; and (b) on $46,660.27 from 1–1–81 to the date of this judgment.

Second, in the event the testimony concerning the sale and lease-back of the drilling equipment was meant to constitute evi-

---

2. The evidence is insufficient to permit the Court to determine damages under the benefit of the bargain rule. There is no evidence from which the Court could deduce the value of the Rantoul partnership had the representation that the Caylor North wells were producing or productive been true.

dence of damages, the Court finds such evidence insufficient. Furthermore, the debts representing plaintiffs' investments in the Johnson County Partnerships (e.g., the assignments) are dischargeable and not included in plaintiffs' damages. Also, no damages can be awarded for defendants' charging of excessive well supervisory fees, as that allegation either related to the breach of fiduciary claim, or to the malicious injury claim, which were, with the exception of the conversion of Caylor South, denied. The Court also notes that it might have had difficulty assessing damages had it sustained the complaint as to the Johnson County Partnerships since nonparty M & H Oil, not plaintiffs individually, owns all but a small part of the partnership interests and since part of the debt assigned to plaintiffs is owed by Mid–States Energy and part by Novak.

Finally, plaintiffs seek punitive damages from defendants in excess of $10,-000. The Court will not grant plaintiffs' claim. Punitive damages are not the remedy provided for by Congress for fraud in incurring a debt. As stated in *In Re McClure,* No. 85–20128, Adv. No. 85–0043 (Bankr.D.Kan.1986) (Franklin, J.):

> If Congress intended for this Court to award punitive damages in this situation, Congress would have specifically provided for punitive damages. See, e.g., 11 U.S.C. § 303(i)(2)(B) (Court may grant judgment for punitive damags against any petitioner that filed an involuntary Chapter 11 petition in bad faith). The specific remedy provided for in section 523(a)(2)(A) in nondischargeability of a generally dischargeable debt.

### SUMMARY

The Court finds that judgment should be awarded plaintiffs on their § 523(a)(2)(A) and (a)(6) complaint in an amount set forth herein.

Judgment for defendants should be entered on all remaining counts.

The foregoing constitutes Findings of Fact and Conclusion of Law under Bank-

ruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure.